LEWIS G. TEWKSBURY *vs.* B. LAKE NOYES.

Hancock.    Opinion, December 2, 1941.

*Abraham M. Rudman,*

*Abraham Stern,* for plaintiff.

*William B. Blaisdell,*

*Peter Boiola,* for defendant.

SITTING: STURGIS, C. J., THAXTER, HUDSON, MANSER, WORSTER, MURCHIE, JJ.

THAXTER, J.   This bill in equity for specific performance of an alleged contract was heard by a single justice who entered a decree sustaining the bill and granting the relief prayed for. The defendant filed an appeal which is now before us.

The substance of the bill is that the defendant acting through his son, G. Howard Noyes as agent, entered into an oral contract with the plaintiff in October, 1927, under the terms of which the defendant agreed to sell to the plaintiff fifty per cent of the capital stock of the Stonington Opera Company, then represented by forty shares, for a price of $4,000.00; that payments were to be made in installments "over such a period of time as the plaintiff might require to pay said price in full," and interest was to be paid at six per cent; that April 1, 1928, one-half the dividends on the stock were paid to the plaintiff, in part by a check and in part by a credit, on account of the purchase price; that on October 9, 1928, the plaintiff paid to the defendant, through his agent, G. H. Noyes, $900.00, for which he received a receipt, the notation on which read "to date on a/c purchase half interest in Stonington Opera Company. Bal. due $3100.00"; that on January 18, 1929, the plaintiff paid $100.00 on account of interest, receiving a receipt from G. H. Noyes as agent for the defendant, the notation on which read "on a/c Opera Co. interests, making $1000.00 pd. on $4000.00 half interest. Interest paid to date"; that on February 10, 1932, there was a further payment of $540.00 for which a receipt was given by the agent with the notation, "in full for

interest on balance due for one-half interest up to Jany. 1, 1932. a/c now stands with $3000.00 due on principal."; that on June 4, 1935, there was a further payment by check of $900.00, the notation on which reads, "For interest and payment on principal on a/c purchase of half interest in stock of Stonington Opera Company," which check was endorsed "B. L. Noyes by G. H. Noyes." The bill then goes on to allege that the stock of the Stonington Opera Company was closely held and not listed and that the plaintiff has asked for the delivery of the stock in accordance with the agreement, on payment of the balance due, but that the defendant has refused to deliver the same.

The answer contains a plea setting up as a defense, firstly, laches, and secondly, the statute of frauds, the laches being based on the fact that the son, G. Howard Noyes, died in 1939, and due to that and to the delay by the plaintiff in bringing his bill, the defendant has been placed at a disadvantage in presenting his case. The answer to the merits denies the allegations of the bill except that the defendant refused to transfer the stock, such refusal being justified on the ground that he never made the agreement with the plaintiff as alleged and that he never authorized any person or persons to make it.

The sitting justice found that the allegations of the bill were true. He specifically called attention to the payment of one-half of the dividends to the plaintiff and to the payments which were made to the defendant on account of the purchase price; and it is apparent that, in the light of the documentary proof and the defendant's own testimony, he took very little stock in the claim of the defendant that he knew nothing about the agreement until after his son had died. It appeared that certain additional stock had been issued since the original agreement had been made, and the decree, which overruled the plea, ordered the defendant, on the payment of the balance due, which was found to be $3,611.96, to turn over to the plaintiff forty-eight and one-half shares, being one-half the total amount of stock found to be issued and outstanding.

On the issue raised by the denial of the defendant of the allegations of the bill, the question before the sitting justice was one of fact, and it is well settled that on such an issue his finding will not be reversed unless the party who appeals shows that it is manifestly wrong. *Androscoggin County Savings Bank* v. *Tracy*, 115 Me., 433, 99 A., 257; *Tebbetts* v. *Tebbetts*, 124 Me., 262, 127 A., 720; *Meader* v. *Cummings*, 131 Me., 445, 163 A., 792.

The plaintiff testified that from 1923 to 1927 he was in the business of exhibiting moving pictures in Stonington and that during the same period the Stonington Opera Company, of which the defendant was a stockholder, was displaying pictures in competition with the plaintiff. He testifies that in September, 1927, he entered into an oral agreement with George H. Noyes, who was acting as agent for his father. The essential terms of the agreement are stated by the plaintiff as follows:

> "A. We agreed, orally, that I should have fifty per cent of the stock of the Stonington Opera Company and that he and I should manage the affairs of the company; that I should close up my theater that I was operating personally and they would allow me four hundred dollars for closing that theater, to offset some liabilities which I had in the building, and that we start operating as partners in the corporation, starting October 1st, 1927."

Pursuant to this arrangement the plaintiff, according to his testimony, closed his own theater, was paid $400.00 in accordance with the agreement, and October 1, 1927, became general manager of the theater run by the Stonington Opera Company. George H. Noyes had charge of the mechanical operation and the finances, and both he and the plaintiff were paid $50.00 per month as salary, which was cut during the years when business was poor. The plaintiff says that B. Lake Noyes took part in at least some of the conferences when theater problems were discussed. G. Howard Noyes died before the filing

of the present bill and the defendant complains that he is at a great disadvantage in presenting his defense because his son is not here to testify as to his dealings with the plaintiff. There is, however, no vagueness in the plaintiff's testimony and there is substantial corroboration of it in the exhibits which have been offered in evidence. These show that the plaintiff over a period of years received one-half of the dividends declared by the corporation. One is a statement showing the application of one-half of the dividends of $300.00 declared for the first quarter of 1928. This shows a total dividend of $300.00 and the "proportion to L. G. Tewksbury $150.00," a deduction of $108.00 for interest on $3,600.00 paid the defendant, and a check to Tewksbury of $42.00 to settle the balance. Another exhibit is a receipt to the plaintiff dated October 9, 1928, showing $900.00 "to date on a/c purchase half interest in stock of Stonington Opera Co. Bal. due $3100.00." This receipt is signed "G. Howard Noyes." January 18, 1929, there is another receipt for $100.00 signed "B. L. Noyes, M. D. G. H. Noyes." This receipt bears the legend, "on a/c Opera Co. interests, making $1000.00 pd. on $4000.00 half interest. Interest pd. to date." February 10, 1932, there is another receipt for $540.00 for interest "on balance due for ½ interest up to Jany. 1, 1932, a/c now stands with 3000.00 due on principal." This is signed "B. L. Noyes, M. D.  G. H. Noyes." June 4, 1935, the plaintiff drew a check for $900.00 to the order of the defendant bearing the notation that it was "For interest and payment on principal on a/c purchase of half interest in stock of Stonington Opera Co." This was endorsed "B. L. Noyes by G. H. Noyes" and deposited to the defendant's personal account.

All of this evidence substantiates the claim of the plaintiff with respect to the substance of his contract with G. Howard Noyes, the son. Had G. Howard Noyes been alive at the time of the trial, would he have repudiated an agreement which he had repeatedly acknowledged over his own signature?

The next claim of the defendant is that the son, if he assumed to make such an agreement, had no authority to do so.

The defendant testified that his son had free access to his books and had done everything he wanted to with them over a long period of years, in fact "for years before he ever went to the Opera Company." He drew money from his father's checking account and deposited money to it. The following testimony indicates clearly the extent of his authority.

"Q. As a matter of fact, you trusted your son explicitly, didn't you?
"A. Yes.
"Q. And you had given him unlimited authority to do about as he pleased in handling the affairs?
"A. In the managing of that thing and handling it that way, yes."

The record indicates not only that the defendant gave his son authority to act for him generally but that with respect to the theater transactions he knew what his son had done and accepted the benefits of the agreement which his son had made.

From the records of a directors' meeting of the Stonington Opera Company, attested by Estelle R. Noyes, the wife of the defendant, we find the following: "Treasurer, B. L. Noyes announced his present willingness, as he had offered several times before, to transfer to L. Tewksbury his full interest rights he had agreed upon 12 years ago per a verbal understanding made by him, in the presence of G. Howard Noyes to Tewksbury." The defendant admits that he was present at the meeting and that the record as kept by his wife is correct with the exception of the words, "in the presence of G. Howard Noyes to Tewksbury." We have, therefore, a clear admission here by the defendant that there had been a verbal agreement made by him twelve years before for the transfer of certain stock in the Opera Company to the plaintiff. He admits knowing that dividends were being paid to himself and to the plaintiff on the stock. Why, it may be asked, would he assent to the payment of such dividends if the plaintiff was not regarded as a stockholder? The defendant admits that at one time his son deliv-

ered to him a check of the Stonington Opera Company payable to L. G. Tewksbury and endorsed to the defendant and that this check was credited to the defendant's personal account and that in his personal check book there was an entry with respect to it, "L. G. Tewksbury, int. $146.50." What could the interest have been except on the loan which was for the balance of the purchase price of the stock? He admits that this entry is in his own handwriting with the exception of the word "interest." But he offers no explanation of why Tewksbury was paying him money if it was not for interest. It is incredible that payments should have been made by the plaintiff from time to time, one of $900.00, which were deposited to the defendant's personal account and that he knew nothing about them or why they were made. We do not think that further discussion of the evidence on this point is necessary. It amply supports the finding of the sitting justice.

Counsel for the defendant evidently recognized that some explanation of the dealings between the plaintiff and the defendant's son was required. And what do they say? They say that the plaintiff and the son joined together to perpetrate a fraud on the defendant. Repeatedly does the father through his counsel in their written argument charge his son with fraud. The inference·is inescapable, say counsel, that the plaintiff "and George Howard Noyes were perpetrating a fraud on both the Stonington Opera Company and Dr. Noyes." We fail to find a shred of evidence to support this accusation. The father bemoans the fact that his son is dead and that he does not have his testimony as to the arrangement made with the plaintiff. On the other hand, the son is not here to refute the charge of fraud which the father now casts against him.

It seems clear to us that the contract was made as testified to by the plaintiff, that it was not vague or indefinite, that the father had repeatedly held the son out as his agent possessing wide authority, and that, in any event, the defendant is bound by the agreement, the benefits of which he has knowingly accepted. *City of Belfast* v. *Belfast Water Co.*, 115 Me., 234, 98

A., 738, L. R. A., 1917B, 908; *Wilkins* v. *Waldo Lumber Co.*, 130 Me., 5, 153 A., 191.

The defendant contends that specific performance is not a proper remedy for the breach of such an agreement as is set out in the bill. It is, however, hard to see how the plaintiff's loss could be compensated for by money damages. The contract was one whereby the plaintiff was to become the owner of a half interest in the business, which placed him in an advantageous position with respect to management and control. The stock had no market value and its true worth depended almost altogether on the success of its management. Under these circumstances, the law is clear that specific performance may be enforced. *General Securities Corporation* v. *Welton*, 223 Ala., 299, 135 So., 729; *Rimes* v. *Rimes*, 152 Ga., 721, 111 S. E., 34, 22 A. L. R., 1030. See *Draper* v. *Stone*, 71 Me., 175.

The sitting justice properly decided that there was no laches which would bar the relief sought by the plaintiff. "Laches cannot be predicated on passage of time alone." *Elston* v. *Elston & Co.*, 131 Me., 149, 156, 159 A., 731, 734. In addition, there must be prejudice to the adverse party because of the delay, and for the delay there must be no reasonable excuse. *Leathers* v. *Stewart*, 108 Me., 96, 101, 79 A., 16, Ann. Cases, 1913B, 366; *Duryea* v. *Elkhorn Coal & Coke Corp.*, 123 Me., 482, 124 A., 206; 10 R. C. L., 396, 402. There is no evidence that the plaintiff delayed bringing his bill because he was anticipating the death of the defendant's son, and from the evidence, as we read it, that unfortunate event worked to the plaintiff's rather than to the defendant's disadvantage. The ruling of the sitting justice was fully warranted.

The statute of frauds is not a bar. Numerous payments were made on account of the purchase price, and the receipts given for these, taken together, are sufficient memoranda to satisfy the statute. *Dean* v. *W. S. Given Co.*, 123 Me., 90, 121 A., 644; 27 C. J., 257-258.

The sitting justice correctly construed the contract as one for the sale of one-half the capital stock of the corporation, and

the fact that more shares were issued subsequent to the date of the contract is immaterial under the facts of this particular case. The plaintiff was entitled to one-half of the stock issued and outstanding at the time that he should elect to take delivery of the same. The sitting justice found that the plaintiff was entitled to 48½ shares on the payment of $3,611.96. The defendant owned or had the right to sell 49 shares, and possibly more, as substantially all the remaining shares were held by members of his family. The evidence is very confusing as to the number of shares outstanding. The parties at one time stipulated that there were 94, but this was apparently an error. The sitting justice found that there were 97. The de-defendant claims 96 -11/100 and the stock record book would seem to support this figure. Whatever the figure may be, the plaintiff is entitled to receive from the defendant an assignment calling for the issuance to him of a certificate representing one-half the total stock issued and outstanding.

The appeal should be sustained and the case remanded to the sitting justice to determine the exact number of shares issued and outstanding, and for the entry of a decree directing the defendant to assign to the plaintiff one-half of such shares on the payment of $3,611.96 with interest from February 3, 1941, to the date of payment, less the plaintiff's costs.

*So ordered.*