NORTHEAST INVESTMENT CO., INC.

v.

LEISURE LIVING COMMUNITIES, INC.

Supreme Judicial Court of Maine.

Jan. 27, 1976.

---

Bernstein, Shur, Sawyer & Nelson by William W. Willard, Portland, for plaintiff.

Murray, Plumb & Murray by Peter L. Murray, Portland, for defendant.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

DUFRESNE, Chief Justice.

The plaintiff-appellee, Northeast Investment Co., Inc. (Northeast), by complaint dated August 31, 1973, is seeking from the defendant-appellant, Leisure Living Communities, Inc. (Leisure Living), damages for breach of contract in the amount of $91,666.70 and specific performance of that aspect of the contract under which Northeast claims an option to purchase twenty thousand (20,000) shares of Leisure Living stock. Northeast filed a motion under Rule 4A, M.R.Civ.P. to attach the real estate of Leisure Living in the amount of $100,000.00.[1] On October 30, 1973 a Justice of the Superior Court, after hearing on the motion upon affidavits submitted by both parties, found "that there is a reasonable likelihood that the Plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than $100,000.00," and ordered that "an attachment of the real property may be made against the Defendant's property in the amount of $100,000.00." Following an unsuccessful attempt to have the interlocutory ruling reported to the Law Court, Leisure Living seasonably appealed. We deny the appeal.

*I*

*Appealability of the interlocutory order approving the attachment*

The parties agree that the order granting Northeast the right to attach the real estate of Leisure Living in the amount of $100,000.00 is interlocutory in nature, and not a final judgment, order or decree. Indeed, an order permitting or denying an

---

1. Rule 4A. Attachment
"(a) Availability of Attachment. In connection with the commencement of any action under these rules, real estate, goods and chattels and other property may, in the manner and to the extent provided by law, but subject to the requirements of this rule, be attached and held to satisfy the judgment for damages and costs which the plaintiff may recover.
"(c) * * *
No property may be attached unless such attachment for a specified amount is approved by order of the court. Except as provided in subdivision (f) of this rule [ex parte order approving attachment], the order of approval may be entered only after notice to the defendant and hearing and upon a finding by the court that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment.
An action in which attachment of property is sought may be commenced only by filing the complaint with the court, together with a motion for approval of the attachment. The motion shall be supported by affidavit or affidavits meeting the requirements set forth in subdivision (h) of this rule.
 *     *     *     *     *
"(h) Requirements for Affidavits. Affidavits required by this rule shall set forth specific facts sufficient to warrant the required findings and shall be upon the affiant's own knowledge, information or belief; and, so far as upon information and belief, shall state that he believes this information to be true."

attachment does not conclude either party to the controversy upon any question of law or fact involved in the issues to be tried in the main action and the result of the trial may entirely eliminate the interlocutory matter from the case. A judgment, order or decree is interlocutory and not final which does not fully decide and dispose of the whole cause but leaves some questions for the future consideration and adjudication of the court. See *Fidelity & Casualty Company v. Bodwell Granite Company,* 1906, 102 Me. 148, 66 A. 314.

The present statute[2] governing the jurisdiction of the Law Court does not specifically provide immediate reviewability on appeal of Superior Court rulings granting or denying attachments as some statutes in other jurisdictions expressly authorize. See *Fredericksen v. Harney,* 1962, 199 Cal.App.2d 189, 18 Cal.Rptr. 562; *State v. District Court of the Tenth Judicial District,* 1954, 128 Mont. 526, 278 P.2d 1000; *First Trust & Savings Bank v. Randall,* 1936, 57 Idaho 126, 63 P.2d 157. Nor does our statute talk in terms of appealability from final judgments. Rule 73, M.R.Civ. P. similarly does not address itself specifically to final judgments, since it provides generally:

> "Whenever a judgment of the Superior Court or of a single justice of the Supreme Judicial Court is by law reviewable by the Law Court, such review shall be by appeal in accordance with these rules."

Our Court has, however, as a matter of sound judicial policy, adopted the general rule that cases are not ripe for appellate review before the Law Court unless the appeal is from a "final" judgment, except

when otherwise specifically authorized. See *Burt Company v. The Burrowes Corporation,* 1962, 158 Me. 237, 182 A.2d 481; *Hazzard v. Westview Golf Club, Inc.,* 1966, Me., 217 A.2d 217, 222; *Allen v. Cole Realty, Inc.,* 1974, Me., 325 A.2d 19.

True, the statute expressly allows reviewability of interlocutory orders or rulings by reporting the same to the Law Court when they present, in the opinion of the presiding justice, questions of law of such importance as to require review before any further proceedings are taken in the action. This expansion of the statute was made at the time of the adoption of the new rules of civil procedure in 1959. See Public Laws, 1959, c. 317, s. 69. But, we do not view this statutory accommodation to Rule 72(c), M.R.Civ.P. as a legislative design to provide an exclusive method whereby interlocutory orders or rulings may be reviewed by the Law Court. Rather, the new procedure was intended to be additional to the numerous exceptions to the final judgment rule, which our Court has long recognized in those instances in which the peculiar character of the question involved hardly admits of postponement, if any benefit is to be derived from it by the aggrieved party. See *Stevens v. Shaw,* 1885, 77 Me. 566, 1 A. 743 (compelling the indorsement of the name and residence of the assignee on the writ); *Munsey, Executor v. Groves,* 1955, 151 Me. 200, 117 A.2d 64 (whether a special appearance through counsel conferred jurisdiction of the person); *Socec v. Maine Turnpike Authority,* 1957, 152 Me. 326, 129 A.2d 212 (interlocutory issue—whether the proceeding was in equity or at law with the right to jury trial involved); *Northland Indus-*

---

2. 4 M.R.S.A. § 57. Jurisdiction; . . .
   "The following cases only come before the court as a court of law: Cases on appeal from the Superior Court or a single Justice of the Supreme Judicial Court; questions of law arising on reports of cases, including interlocutory orders or rulings of such importance as to require, in the opinion of the justice, review by the law court before any further proceedings in the action; agreed statement of facts; cases presenting a question of law; all questions arising in cases in which equitable relief is sought; motions to dissolve injunctions issued after notice and hearing or continued after a hearing; questions arising on habeas corpus, mandamus and certiorari and questions of state law certified by the federal courts.

    *    *    *    *    *

    . . . ."

*tries, Inc. v. Kennebec Mills Corporation,* 1965, 161 Me. 455, 214 A.2d 100 (ruling that assignee was not a party in interest because of purportedly invalid assignment); *Loyal Erectors, Inc. v. Hamilton & Son, Inc.,* 1973, Me., 312 A.2d 748 (discharge of trustee); *Cranston v. Commercial Chemical Corp.,* 1974, Me., 324 A.2d 301 (dissolution of attachment of real estate).

In *Foisy v. Bishop,* 1967, 232 A.2d 797, we reaffirmed the exception to the final judgment rule. There, we held that an appeal from an interlocutory order vacating an attachment of real estate was an exception to the "final judgment" rule and was immediately reviewable on appeal since "great and irreparable loss" might otherwise result.

Thus, this Court has consistently followed the doctrine espoused by the Supreme Court of the United States in *Cohen v. Beneficial Industrial Loan Corp.,* 1949, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528, and known as the collateral order exception to the final judgment rule. It involves decisions

"which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." ·Id. 337 U.S. at 546, 69 S.Ct. at 1225, 1226.

In *Cohen,* the interlocutory order at issue was the ruling of the District Court denying the corporate defendant's motion to require the plaintiff to post security in the amount of $125,000. The Court said that, if the issue had to await the final disposition of the merits of the main case, it will then be too late effectively to review the reference order and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably.

In *Foisy,* this Court cited *Swift & Co. Packers v. Compania Colombiana Del Car-*

*ibe,* 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L. Ed. 1206, which involved an order vacating a foreign attachment of a vessel. We note that, by way of dictum, the Swift Court volunteered:

"The situation is quite different where an attachment is upheld pending determination of the principal claim.

\* \* \* \* \* \*

"In such a situation the rights of all the parties can be adequately protected while the litigation on the main claim proceeds."

Although our Court has ruled that an order denying or dissolving an attachment of real estate is immediately reviewable on appeal notwithstanding its interlocutory characteristic, this is the first time we are faced with the issue of immediate appealability of an order allowing such an attachment.

In *West v. Zurhorst,* 1970, 2 Cir., 425 F.2d 919, the Second Circuit followed the holding in *Cushing v. Laird,* 1882, 107 U.S. 69, 2 S.Ct. 196, 27 L.Ed. 391 and the dictum in *Swift & Co. Packers v. Compania Colombiana Del Caribe,* supra, in dismissing for want of jurisdiction an appeal from the denial of defendants' motion to vacate an ex parte order of attachment against their land, on the ground that "[w]hile the grievance created by an improper attachment *pendente lite* is 'important,' [*Cohen v. Beneficial Industrial Loan Corp.,* 1949, 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 1226, 93 L.Ed. 1528] it is not important enough to make the decision 'final.'" (Emphasis in original) The Court viewed the increase in the appellate caseload as sufficient reason against an "expansive reading" of *Cohen.*

In *Chabot v. National Securities and Research Corporation,* 1961, 2 Cir., 290 F.2d 657, the same Court had previously stated that an "[a]ttempt at distinction based on the circumstance that in *Cohen* the order of the District Court had denied security whereas here the order required it, flies in

the face of reason." The *Chabot* Court concluded that, "since the clause as to security is not a provision the alleged breach of which constitutes plaintiffs' claim, the case is still like *Cohen* in that the orders made 'a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it.' " See also *Phelps v. Burnham,* 1964, 2 Cir., 327 F.2d 812.

But, in *Pasquarella v. Santos,* 1969, 1 Cir., 416 F.2d 436, the First Circuit ruled that an order to post a removal bond was interlocutory and appealable within the *Cohen* rule.

In *McInnes v. McKay,* 1928, 127 Me. 110, 141 A. 699, affirmed by *McKay v. McInnes,* 1929, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975, this Court recognized that

> "[p]roperty in legal conception is the total of the rights and powers incident to a thing rather than the thing itself. The legal right to use and derive a profit from land or other things is property. * * *. And the power of disposition at the will of the owner is property. Deprivation does not require actual physical taking of the property or the thing itself. It takes place when the free use and enjoyment of the thing or the power to dispose of it at will are affected."

The *McInnes* Court agreed that an attachment of real estate deprived one of property, but ruled

> "we do not think it is the deprivation of property contemplated by the Constitution. And if it be, it is not a deprivation without 'due process of law' . . .."

This concept that the right of an owner of real estate to freedom from attachment is of such insignificance as to be without the scope of the protective guarantees of due process of the Fourteenth Amendment was rejected by a three-judge District Court in *Gunter v. Merchants Warren National Bank,* 1973, 360 F.Supp. 1085. In *Gunter,* the Court viewed the effect re-

sulting from an attachment of real estate as a restriction on the power of the owner to alienate his property and a significant deprivation of property within the protection of the Due Process Clause, in that the attachment creates a lien on the property and effectively deprives the owner of his ability to convey a clear title while the attachment remains outstanding. It has a serious potential for substantial harm to the defendant. Thus, notwithstanding *McInnes v. McKay, Gunter* ruled the prejudgment-attachment-of-real-estate procedures of Chapter 507 of Title 14, M.R.S.A. and of Rule 4A of the Maine Rules of Civil Procedure which permitted the prejudgment attachment of real estate without prior notice and hearing to be violative of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States and hence void and unenforceable. See *Hutchison v. Bank of North Carolina,* 1975, 392 F.Supp. 888, 894.

Following the *Gunter* decision, Rule 4A, M.R.Civ.P. was modified by amendment effective August 1, 1973 subjecting real estate attachments to the same prerequisites, including preattachment notice and hearing, which Rule 4A mandated respecting the attachment of personal property.

The right of an owner of real estate to alienate his property freely without the impediment of a real estate attachment has been given such substantial standing that, before the ancillary process of real estate attachment made available in support of the State's legitimate interest in facilitating creditor recovery may be resorted to, the creditor-plaintiff must under the rule carry the burden of persuasion to the court

> "that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment."

Such limitations on the right to attach real estate in aid of the prosecution of a lawsuit serve to protect the interests of a defendant against frivolous, unwarranted or false claims.

We, therefore, hold that an order approving a real estate attachment is a decision of such significance as to fall in that "small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Industrial Loan Corporation,* supra.[3]

## II

*Standard—Reasonable likelihood of plaintiff's recovery of judgment*

Having determined that the approval of an attachment is an interlocutory order which, nevertheless, is immediately appealable to the Law Court, we must now address the issue, whether Rule 4A was properly applied in the instant case. Such, in turn, must preliminarily depend on the quality of showing the Rule compels the plaintiff to make in order to support its entitlement to the requested attachment.

Hence, the immediate issue is, what standard of proof the trial court should apply, when hearing a motion for approval of at-

tachment of real estate, before finding "that there is a reasonable likelihood that the plaintiff will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment over and above any liability insurance shown by the defendant to be available to satisfy the judgment."

The defendant, Leisure Living, contends that the purpose underlying Rule 4A is to prevent a plaintiff from obtaining potentially onerous prejudgment security by way of attachment "when there is a good faith dispute as to the merits [of a claim] and when the chances are equal or nearly equal that the plaintiff will not ultimately prevail." It opts for a standard pursuant to which the court could not make the prerequisite finding of "reasonable likelihood" of recovery of judgment "if the court's mind is evenly balanced as to which party will ultimately prevail."

Rule 4A was expanded to cover prejudgment real estate attachments for the purpose of fitting into a State policy of long standing due process safeguards of notice and hearing as an accommodation between the State interest in affording security to creditors and minimal protection to debtors against invalid claims and/or the abuse of excessive attachments. The "likelihood of success" standard will keep the process more in syntony with previous State policy than a "preponderance of the evidence" test.

3. In so deciding, we have not overlooked sections 4606 and 4607 of 14 M.R.S.A., which authorize any defendant, whose interest in real estate is attached on mesne process, to petition the Superior Court for a determination of the value of the defendant's real estate interest attached and for the release of the attachment, pending appeal to the Law Court, upon the giving by the defendant to the plaintiff of a bond, as ordered by the Court, in the appropriate amount and terms as provided in the reference statute. Rule 4A (g) recognizes the viability of this statute, wherein it provides:
"Nothing herein shall be construed to abolish or limit any means for obtaining dissolution, modification or discharge of an attachment that is otherwise available by law."
It is true that the availability of the statutory bond provision was intended to minimize a defendant's exposure to harm when his real estate is attached; nevertheless, the probability of irreparable injury, notwithstanding the stated statutory bond provision, is sufficiently great to justify immediate appellate review of an order approving a real estate attachment. A real estate attachment may critically impair a defendant's ability to participate effectively in judicial proceedings designed to resolve the main dispute between the parties. See *Lebowitz v. Forbes Leasing and Finance Corporation,* 1972, 3 Cir., 456 F.2d 979.

The term "likelihood of success" connotes mere probability of success or a favorable chance of success. See *Verhelle v. Eveland,* 1957, 347 Mich. 612, 81 N.W.2d 397.

Clearly, the inquiry into the plaintiff's likelihood of success in the main action requisite to support approval of a prejudgment real estate attachment need not take the form of a full adjudication of the rights of the parties. Such adjudication better be left for determination at the time of trial rather than in the preliminary hearing contemplated by Rule 4A.

The federal cases speak similarly of "likelihood of success" in terms of favorable chance of success. If a claim for which security by means of real estate attachment is requested is not of such insubstantial character that its invalidity so 'clearly appears as to foreclose a reasonable possibility of recovery, then, such a claim would be within the "likelihood of success" standard required by the Rule. See *Mitchell v. W. T. Grant Company,* 1974, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed. 2d 406, where it is stated:

"On the contrary, it seems apparent that the seller with his own interest in the disputed merchandise *would need to establish in any event only the probability that his case will succeed . . . .*" (Emphasis ours)

In *Bell v. Burson,* 1971, 402 U.S. 535, 540, 91 S.Ct. 1586, 1590, 29 L.Ed.2d 90, 96, where factual analogy to the instant case appears, the Court said:

"Since the only purpose of the provisions before us is to obtain security from which to pay any judgments against the licensee resulting from the accident, we hold that procedural due process will be satisfied by an inquiry limited to the determination whether there is a *reasonable possibility of judgments* in the amounts claimed being rendered against the licensee." (Emphasis added)

In *Sniadach v. Family Finance Corp. of Bay View,* 1969, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349, Justice Harlan in his concurring opinion viewed within due process requirements a pretrial hearing aimed

"at establishing the validity, *or at least the probable validity,* of the underlying claim against the alleged debtor *before* he can be deprived of his property or its unrestricted use." (First emphasis ours —second in original)

### III

*Reasonable likelihood of plaintiff's recovery of judgment in the instant case*

In order to assess the correctness of the Justice's ruling approving the attachment, we must first consider the pleadings upon which his determination was made. The record reveals that Northeast's motion for allowance of attachment of Leisure Living's real estate in the amount of $100,000.00 was supported in the Court below by the affidavits of George T. Kattar, president of the plaintiff corporation, while the defendant's opposition was formulated through affidavits of Bernard J. Mayer, Jr., the then president of the defendant corporation and John C. Wyman, the defendant's legal representative in a related case pending in the United States District Court for the District of Massachusetts.

The Kattar affidavits expressly purport to be made on personal knowledge pursuant to Rule 4A(h) (footnote 1, supra) and contain the following factual assertions:

On or about February 25, 1970 Mr. Kattar, as president of Northeast, and Mr. J. Allan Bowron, as president of Leisure Living, entered into an oral agreement the breach of which is the subject of the main action. It provided in part for Leisure Living to pay Northeast, or certain other named corporations as might be designated by Mr. Kattar, the sum of fifty thousand

($50,000.00) dollars per year as long as certain loans and notes payable to James Talcott, Inc. remained unpaid. In the deal, Northeast was granted the option to purchase twenty thousand (20,000) shares of Leisure Living stock. The verbal arrangement between the two companies was intended as security in the purchase by Leisure Living of certain lands owned by Sebago Estates, Inc. and Gunstock Acres, Inc. in connection with which the loans and notes payable to James Talcott, Inc. were executed.

Indeed, Northeast undertook to guarantee these Talcott loans and notes for such time as they remained unpaid, and so did Mr. Kattar, individually and for Community Investment Corporation, of which corporation he was president and majority shareholder. In addition thereto, Mr. Kattar promised new guarantees of said loans and notes from Tri-State Development Corporation, American Heritage Properties, Inc., The Second Presidential Corporation and Castle Shores, Inc. Mr. Kattar had a controlling voice in said corporations by reason of his position of president or his ownership of the majority of the stock. The loans and guarantees involved in the agreement were in fact made.

In further consideration of Leisure Living's undertaking, Mr. Kattar individually and for the named corporations, promised to "provide during the life of said guarantees, such consulting services as Leisure Living Communities, Inc. would request from time to time."

Pursuant to their contractual obligations, Mr. Kattar and the named corporations "performed numerous consulting services to Leisure Living Communities, Inc. at their request, including but not limited to, assisting with a zoning problem, the purchase of sixty (60) acres of land desired by Leisure Living Communities, Inc., the preparation of a paper giving many suggestions on how to develop property, and the conducting of several sales conferences with salesman."

Leisure Living, so Mr. Kattar's affidavit states, failed to make the payments of fifty thousand ($50,000.00) dollars per year to Northeast since October 25, 1971 and on July 30, 1971 refused Northeast's request to execute the purchase option of twenty thousand (20,000) shares of Leisure Living stock.

Contrary to the Kattar affidavits which are based solely on personal knowledge of alleged positive facts, the Mayer affidavit is founded "upon personal knowledge and upon information and belief based upon careful inquiry" and accentuates the negative.

It alleges that the affiant has no knowledge of any reference oral agreement, because a careful search of the records and other papers of Leisure Living reveals no such agreement, nor any act or undertaking pursuant thereto. Mr. Mayer further discloses that he bases part of his affidavit on the information received from an unnamed representative of James Talcott, Inc. to the effect that Talcott's records do not show any such act or undertaking of guaranty as claimed by Northeast and that in the opinion of said Talcott representative

"on February 25, 1970 Northeast Investment Co., Inc. was released from any pre-existing guaranty of indebtedness which might have existed and that no new guaranty was entered into by Northeast Investment Co., Inc. on or after that date."

Mr. Mayer's affidavit further concludes that on the basis of his examination of Leisure Living's records and papers,

"it is my understanding and I therefore believe that the indebtedness to James Talcott, Inc. was assumed by a subsidiary of the company, New England Properties, Inc., and was to be repaid over a considerable period of time well in excess of one year."

Mr. Mayer further states he has no knowledge of any consulting services per-

formed by Northeast or Mr. Kattar subsequent to February 25, 1970.

We need not concern ourselves with the Wyman affidavit as it merely confirms, through Mr. Kattar's deposition, that, whatever agreement there was, it contemplated a period of performance well in excess of one year, a fact which the parties do not seriously dispute.

An analysis of the Mayer affidavit discloses that the facts therein alleged which would tend to dispute affirmatively the plaintiff's cause of action, to wit, "that on February 25, 1970 Northeast Investment Co., Inc. was released from any pre-existing guaranty of indebtedness which might have existed and that no new guaranty was entered into by Northeast Investment Co., Inc. on or after that date" were not based on the personal knowledge of the affiant, but are stated to be *the opinion* of an undisclosed representative of James Talcott, Inc. Mr. Mayer "made oath that the foregoing statements by him made are true to the best of his knowledge and belief."

Under Rule 4A(h), specific facts sufficient to warrant the findings necessary to the approval of the real estate attachment must be set forth "and [they] shall be upon the affiant's own knowledge, information or belief; *and, so far as upon information and belief, shall state that he believes this information to be true."* (Emphasis supplied). Nowhere, does Mr. Mayer state that he believed the information which he received from the unnamed representative of James Talcott, Inc. to be true. Thus, the Mayer affidavit was deficient in the most important aspect of the facts it purported to present in opposition to the plaintiff's motion for an order permitting the attachment of the defendant's real property, a fact which the Justice below

most probably took into consideration in his evaluation of the affidavits upon which he had to make his decision.

■ But, where the trial justice makes his determination of an issue entirely on documentary evidence and affidavits without receiving any oral testimony from witnesses he can see and hear, an appellate court is then free to make its own findings from the same evidence, without reference to the findings of the single justice. The "clearly erroneous" rule (Rule 52(a), M.R.C.P.), which mandates that findings of fact be not set aside unless clearly erroneous and that due regard be given to the opportunity of the trial court to judge of the credibility of the witnesses, is not applicable in such instances. *Allen v. Kent,* 1957, 153 Me. 275, 136 A.2d 540; *Matthews v. R. T. Allen & Sons, Inc.,* 1970, Me., 266 A.2d 240; *Davis v. Interstate Motor Carriers Agency,* 1970, 85 S.D. 101, 178 N.W.2d 204; *Keyes v. Keyes,* 1932, 51 Idaho 670, 9 P.2d 804; *McDermott v. Halliburton,* 1930, 220 Ala. 553, 126 So. 854. (Contra: *Atkins, Kroll & Co. v. Broadway Lumber Company,* 1963, 222 Cal.App.2d 646, 35 Cal.Rptr. 385, 12 A.L.R.3d 880).

We have examined the affidavits submitted to the Court below and, taking into account the positive nature of the plaintiff's affidavits as opposed to the negative aspect of the defendant's counteraffidavits, we are convinced that Northeast has demonstrated a reasonable likelihood of recovery of judgment in its main action, provided it has made a similar showing respecting Leisure Living's affirmative defense of the statute of frauds,[4] which Northeast asserts ineffective by reason of its own part performance of the contract.

---

4. 33 M.R.S.A. § 51. *Writing required;* .
"No action shall be maintained in any of the following cases:

\*     \*     \*     \*     \*

(5) *Agreement not to be performed within one year.* Upon any agreement that is not to be performed within one year from the making thereof;

\*     \*     \*     \*     \*

. . . ."

## IV

### The Statute of Frauds

That the reference oral agreement was within the class of contracts on which action was prohibited under 33 M.R.S.A. § 51(5) appears clearly.

The rule to apply in order to determine whether an oral contract comes within the ban of the statute has been stated by this Court in *Marshall v. Lowd*, 1958, 154 Me. 296, 305–6, 147 A.2d 667, 672:

> "[T]he contract . . . is within the statute of frauds if the performance thereof necessarily requires more than one year, or if the manifest intent and purpose of the parties gathered from the words used and the circumstances existing at the time is that more than one year should be taken for its performance."

The agreement called for a $50,000 *annual* payment, thus inferentially implying that payments were to be made for more than one year. Indeed, the payments were to continue "as long as said loans were unpaid and said liabilities in existence." Mr. Kattar in his deposition stated the agreement was to be in effect for five years. Moreover, we take note of the fact the guaranty related to a rather large real estate development project which, in the normal course of events, would not allow its discharge within one year.

This Court in a somewhat similar case used the following language:

> "Mr. Longcope's contract, as appears from his own testimony, required him to act with Mr. Saddlemire during the time that the latter is engaged in carrying into execution vast plans of state-wide vacational, agricultural and industrial development. These ambitious projects certainly require more than a year for completion. *The parties so understood and intended.* It was, indeed, stated in the contract, as testified to by the plaintiff, that the work undertaken would take 'a great many years,' and that 'during that time' the plaintiff was to act as Mr. Saddlemire's right-hand man." (Emphasis added)

■ But, under certain circumstances, part performance of an unwritten contract may authorize a court of equity to compel specific performance by the other party in contradiction to the positive terms of the statute of frauds on the ground of equitable estoppel based on an equitable fraud. This Court said in *Woodbury v. Gardner*, 1885, 77 Me. 68, at 70 and 71:

> "After having induced or knowingly permitted another to perform in part an agreement, on the faith of its full performance by both parties and for which he could not well be compensated except by specific performance, the other shall not insist that the agreement is void.
>
> \*  \*  \*  \*  \*  \*
>
> In other words, partial performance [to exclude the operation of the statute of frauds] is such a carrying out of the agreement by one party thereto, that fraud would result to him unless the other party be compelled to perform his part of it."

The affidavits in positive terms disclose full performance by Northeast, Mr. Kattar and his interrelated companies, of the oral contract by the execution and continued maintenance of the guaranty agreements, causing a drop in their borrowing power and the loss in the sales force; they further support the rendering of numerous consulting services to Leisure Living. In partial consideration for the guaranty, Leisure Living orally promised the grant of an option to purchase twenty thousand (20,000) shares of Leisure Living stock, the execution of which was never acted upon by Leisure Living although requested on July 30, 1971.

■ An oral contract relating to the purchase of corporate stock may be enforced specifically under special circumstances as seem present in the instant case,

such as that Leisure Living stock has no readily ascertainable market value, cannot be easily obtained from other sources, and is of special interest to Northeast as one of the interrelated corporations engaged in the development of sizable real estate projects. If Northeast is hampered by the bar of the statute of frauds, such loss certainly could not be compensated for adequately by money damages. See *Tewksbury v. Noyes,* 1941, 138 Me. 127, 23 A.2d 204.

We conclude that Northeast has demonstrated the reasonable likelihood of recovering judgment in its main action within the requirements of Rule 4A(c) to support the approval of a real estate attachment, even though the contract on which its claim is based was an oral one.

## V

### The Amount of the Attachment

■ Rule 4A(c), as a prerequisite to the approval of a real estate attachment, mandates a showing by the plaintiff that there is a reasonable likelihood that it will recover judgment, including interest and costs, in an amount *equal to or greater than the amount of the attachment* over and above any liability insurance shown by the defendant to be available to satisfy the judgment.

The defendant contends that the plaintiff's specific request for judgment in the amount of $91,666.70 in itself demonstrates error on the part of the presiding Justice when he approved a real estate attachment in the amount of $100,000.00. We disagree. The reference ad damnum clearly relates only to the claimed indebtedness in the principal sum. As an incident of a verdict in its favor, the plaintiff would be entitled to interest at the legal rate of six (6%) percent per annum on the unpaid instalments from the time they ought to have been paid until the date the complaint was filed in court (*Inhabitants of Town of Norridgewock v. Inhabitants of Town of Hebron,* 1957, 152 Me. 280, 128 A.2d 215), and legal interest from that date to the time of entry of judgment also may be recoverable under 14 M.R.S.A. § 1602.[5] A quick computation will disclose a bridging of the gap.

The entry will be

Appeal denied.

All Justices concurring.

---

5. 14 M.R.S.A. § 1602. Interest on judgments "In all civil actions, except those actions involving a contract or note which contract or note contains a provision relating to interest, interest shall be assessed from the date on which the complaint is filed in court, provided that if the prevailing party at any time requests and obtains a continuance for a period in excess of 30 days and the losing party at no time requests and obtains a continuance, interest will be assessed from the time of entry of judgment. From and after date of judgment, interest shall be allowed at the rate of 10% per year."