## MILSTAR MANUFACTURING CORPORATION

v.

## WATERVILLE URBAN RENEWAL AUTHORITY and City of Waterville.

Supreme Judicial Court of Maine.

Feb. 4, 1976.

Weeks, Hutchins, Frye & Welch by Bradford H. Hutchins, Waterville, for plaintiff.

Jolovitz & Niehoff by Lester T. Jolovitz, Waterville, for Waterville Urban Renewal Authority.

Shiro & Jabar by J. William Batten, John P. Jabar, Waterville, for City of Waterville.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD, and DELAHANTY, JJ.

ARCHIBALD, Justice.

This matter comes before us both on appeal and on report. Since the appeal is from the mandate reporting the case, it is evident that sustaining the appeal would automatically void this mandate. Therefore, our preliminary concern is with the issues raised by the appeal.

Waterville Urban Renewal Authority (Authority) in the exercise of its power of eminent domain (30 M.R.S.A. § 4807) acquired title to certain real estate in Waterville formerly known as "Lockwood Park." There is no dispute over the fair market value of the land taken, namely, $80,000.00. When the damages were not paid, Milstar Manufacturing Corporation (Milstar) being the owner of the fee in this land, pursuant to Rule 80B, M.R.C.P., brought a civil action for the purpose of recovering this sum. On motion of the Authority the City of Waterville (City) was joined as a party defendant since the Authority contended that "a question has arisen as to the interest, if any, of the City of Waterville in said premises." Ultimately an agreed statement of facts was executed by all parties, limiting the issues and agreeing to report the same to the Law Court pursuant to Rule 72(b), M.R.C.P., the appropriate order having issued February 12, 1974. Approximately three weeks thereafter the City filed a motion to relieve it from this order. Rule 60(b) M.R.C.P. Following a hearing this motion was denied and the City has appealed.

■ Initially we must determine whether the appeal from the order denying the City's motion is prematurely before us. Since this order did not result in a final judgment, under ordinary circumstances an appeal therefrom would not be ripe for appellate review because the ruling was interlocutory. However, the nonappealability of interlocutory orders is subject to certain well established exceptions. For illustrative cases and the rationale underlying these exceptions, see our very recent decision in *Northeast Investment Co., Inc. v. Leisure Living Communities, Inc.*, Me., 351 A.2d 845 (1976).

The basic legal issues raised by the complaint are before the Court by virtue of the mandate of the report, under which we are required to "render such decision as the rights of the parties require." Our ultimate decision will result in a final judgment, thus rendering moot the issue raised by the appeal.

Under the foregoing circumstances the following language found in *Munsey, Exec. v. Groves*, 151 Me. 200, 202, 117 A. 2d 64, 66 (1955), is appropriate:

"Where, however, it is deemed to be more in the interests of justice that the questions involved should now be determined, and the peculiar character of the

questions here presented hardly permits of postponement if any benefit is to be derived from it by the moving party, exceptions may be entertained by the Law Court before final hearing."

Therefore, in the interests of justice and because of the exceptional posture of this appeal, we deem it appropriate to relax the final judgment rule and discuss the merits of the appeal. *Packard v. Whitten*, 274 A.2d 169 (Me.1971).

We have been furnished with a transcript of the testimony offered in support of the City's motion, which we summarize.

Not later than November 21, 1973, counsel for the three litigants had fairly and objectively agreed to report the case and had stipulated the facts necessary therefor, but no order was obtained carrying into effect this agreement until February 12, 1974.

On December 18, 1973, counsel for the City wrote the following letter to counsel for the plaintiff, sending a copy to counsel for the Authority:

"I regret that this case has not gone forward as agreed to. In view of the suggested procedure, I felt that I must review my entire thinking on this matter.

I originally had agreed to stipulate that the taking was proper but I want to now re-evaluate that position and ascertain whether in fact there is any legal benefit for us to challenge that taking. In any event, for the record, I want the procedure itself in its entirety on the record for the Court."

Several days prior to February 12, 1974, counsel for the plaintiff served notice on both counsel for the City and the Authority that he would bring the agreement to report before the Justice then presiding for the purpose of obtaining the necessary order. This was done. Counsel for the City did not attend the hearing and testified that although he had notice thereof he felt his presence was unnecessary because the issue had become "moot." He further testified he communicated this reason for his nonattendance to a subordinate in the office of the Clerk of Courts by telephone. This information was not made known to the other counsel, who were at the hearing, or to the Justice who ultimately signed the order.

Since Rule 60(b) motions are addressed to the sound discretion of the Justice before whom they are heard, an appeal from the denial of such a motion is subject to reversal only on a clear showing of an abuse of judicial discretion. *Ingham v. Tzikas*, 320 A.2d 665 (Me.1974).

From the record furnished us relating to this motion there is no evidence that counsel for either the Authority or Milstar, when presenting the order to report the case to the Justice below, misrepresented any facts or otherwise acted in bad faith. The City has not shown that any of the facts it had previously agreed upon were contested or erroneous.

There was a suggestion that another Justice of the Superior Court had informally expressed some reservation about the propriety of reporting the case, suggesting that it might be more appropriate to decide the case at the Superior Court level, from which decision an appeal could be taken. This informal opinion would seem to have been the basis for the letter of December 18 quoted *supra*. However, the City made no showing that any prejudice could result to it from reporting the case and neither did it suggest that any additional facts would have been relied upon by the City had the case been tried in the Superior Court.

Since the City has failed to demonstrate any abuse of discretion in the denial of the Rule 60(b) motion, the appeal from this ruling is without merit and must be denied.

We now turn to the issues raised by the report which we summarize as follows:

(a) Did the City of Waterville have any compensable interest in the land taken by eminent domain?

(b) If the City did have such an interest, what was the value of this interest?

(c) Must Waterville Urban Renewal Authority pay interest on $80,000.00 and, if so, from what date and at what rate?

On June 15, 1950, the City and Lockwood-Duchess, Inc., entered into an agreement under the terms of which the City obtained permission to use certain property owned by Lockwood-Duchess, Inc., which became commonly known as "Lockwood Park." The purpose was to effectuate rotary traffic at the western terminus of a bridge crossing the Kennebec River.

Milstar is the successor in title to this real estate and any rights that Lockwood-Duchess, Inc., had in this property are now owned by Milstar.

According to the plans included as exhibits in the record, aided by aerial photographs, it is now clear that the Authority has constructed a public way leading from the western terminus of the bridge directly through, what was Lockwood Park. Rotary traffic has been eliminated and the flow of traffic to a shopping center situated westerly of Main Street in Waterville has been facilitated. Such was the purpose of the Authority when it took the property by eminent domain.

Our first inquiry will be to determine whether the City had any compensable interest in the condemned land. If it had none, then the second issue reported is moot.

Whatever rights the City had in this property were created by the agreement of June 15, 1950, which provided:

"1. The said Company hereby agrees to *permit* the said City to use certain property . . . . This permission to continue for so long as the City shall not be in default of any of the terms of its agreement . . . .[1]

2. Said *permission* so given by the Company is not to be construed *as a dedication* of said property owned by the Company to public use, nor does said *permission* constitute the relinquishment of any rights other than as herein granted; and the City hereby agrees that no *prescriptive rights or rights by adverse possession* shall be claimed as the result of any use under this *permission*.

.    .    .    .    .    .    .

4. The entire area in which this *permissive use* operates, including the so-called Lockwood Park in the center thereof, shall during continuance of the *permission* be under the sole and exclusive control of said City . . . .

.    .    .    .    .    .    .

6. The said City further agrees that the premises in the center of the rotary traffic system as set forth in said plan will *be used for no other purpose except as a park* except by the written consent of the said Company." (Emphasis supplied.)

The City has argued that Milstar's predecessor in title contractually dedicated the property to the City for use as a park and that although there has been a change in the physical characteristics of the area, it still remains a park. However, for the City to argue that the land had been dedicated to public use as a park would be to fly in the face of the plain language of the contract. Paragraph 2 clearly states that the permission given by Milstar's predecessor in title was not to be construed as a dedication to public use, and the City expressly consented to this limitation. Absent an *intent* by the owner of the fee to

1. Milstar complied with the notice requirement of the contract, giving the City 30 days notice of the breach of condition caused by the condemnation of Lockwood Park by the Authority.

dedicate land for public use, a municipality may not acquire any rights therein by *dedication*. *Vachon v. Inhabitants of Town of Lisbon*, 295 A.2d 255 (Me.1972).

■ The City is contending that the property in question is still being used as a park and, therefore, Milstar has shown no breach of the contract entitling it to the damages. The language of Paragraph 6 is persuasive since the City expressly agreed that "the premises in the center of the rotary traffic system" would be used exclusively as a park. As the result of the reconstruction that precise area is now a public highway, although in some adjacent areas the Authority has retained some grass plots on which there are also a few trees. Whatever else a park may be, it is not a public highway designed to accommodate the flow of vehicular traffic.

Having determined that the property in question is no longer being used as a park, we next turn to the question of whether the City acquired any interest in the land condemned which was compensable when this land was taken by the Authority under its power of eminent domain.

The facts in *Inhabitants of the Town of Rangeley v. Snowman*, 115 Me. 412, 99 A. 41 (1916), are analogous to those before us. In 1860 a former owner had given the town of Rangeley oral permission to move a schoolhouse upon his property and to occupy the land as long as the building "was used for school purposes." It was so occupied until 1912 when classes ceased and, in 1914, the defendant, the then owner of the land, broke into and entered the building. An action of "trespass quare clausum" was instituted and the issue was reported on an agreed statement. Since the Court deemed the prior occupancy of the Town to be that of a licensee, its rights as such terminated when the land was no longer used for the permitted purpose and, therefore, its action failed, the Court holding:

"Occupation of a licensee can not be adverse to the true owner while he is claiming to occupy it by virtue of the license, *and as long as the licensee continues to occupy the premises, or exercise the license by claiming it to be a license or an oral permission, said occupation gives no interest in the land, and it cannot be considered adverse to the true owner*, because it is with the consent of the true owner, and a license is a complete answer and defense to a claim of adverse possession set up by the licensee, unless the licensee has occupied or used the premises as his own, openly, exclusively and adversely for the period of twenty years, claiming to be the true owner thereof. . . ." (Emphasis supplied.)

115 Me. at 415–16, 99 A. at 42.

■ On the facts before us, the City occupied the condemned land for over twenty years under permission from Milstar and its predecessor in title, subject to its use only as a park. When that use ceased because the Authority took the property for highway purposes, the City's interest in the land was terminated. *See Moore v. Stetson*, 96 Me. 197, 52 A. 767 (1902).

We conclude that the City, not having any interest in the condemned land, has no right to any part of the $80,000.00 damages.

Such being our conclusion, the second question reported is moot.

Finally, we must address the question of whether Milstar is entitled to interest on the damages, the Authority arguing essentially that the obligation to pay interest does not exist as a matter of law. The reason underlying this argument is that 30 M.R.S.A. § 4807, being the statutory authority for an urban renewal authority to take real property or any interest therein under the power of eminent domain, does not make any provision authorizing the payment of interest. Furthermore, so the Authority says, Milstar prevented an immediate payment of the damages awarded and since Milstar acquired no greater in-

terest in the property taken than it previously had and because it suffered no loss of use of this property since it was already being used for a public purpose, there is no justification for the payment of interest.

As we see it, the Authority's position is falsely premised. The action before us is not based upon the provision of Section 4807 which authorizes an action when the condemnor and the condemnee "cannot agree" on the value of the property taken. Rather, this action is brought to recover the damages which have already been agreed upon but not paid. Furthermore, when the Authority condemned this particular property the contractual right of the City to be in possession of it was terminated and the fee was no longer encumbered by this license. Therefore, Milstar became the owner of the unencumbered fee and, like the owner of any other real property, became entitled to that "just compensation" which the Constitution of Maine mandates being paid.

30 M.R.S.A. § 4807, after specifying preliminary procedures which must be followed by an urban renewal authority in order to acquire title to real property by eminent domain, provides that when these procedures have been accomplished,

"title to such real property, or interest therein, shall vest in the authority in fee simple absolute and said authority thereupon may take possession of said real property, or interest therein."

The parties have stipulated that "the taking was legally accomplished on April 2, 1971."

■ It is the general rule in both state and federal jurisdictions that interest is allowable, not independently but as a part of the damages or just compensation which must be paid when either a state or the federal government exercises the constitutional power of taking property by eminent domain. Article 1, § 21 of the Constitution of Maine, providing "[p]rivate property shall not be taken for public uses without just compensation," constitutionally mandates payment of interest from the date of the taking in order that the property owner receive "just compensation." *Williams v. State Highway Commission,* 157 Me. 324, 172 A.2d 625 (1961). This constitutional principle is stated in Nichols on Eminent Domain, § 8.63, as follows:

"The theory of the law is that when land is taken by eminent domain, or where it is injured in such a way as to create a constitutional right to damages, payment for the land thus affected should be coincident with the taking or injury, and, if for any reason payment is postponed, the right to interest from the time that payment ought to have been made until it is actually made follows as a matter of strict constitutional right."

*See also United States v. 35.163 Acres of Land,* 332 F.Supp. 799 (D.C.Ill.1971). For cases in other jurisdictions see Annot. 46(a), 36 A.L.R.2d 413.

■ We conclude, therefore, that Milstar, having established its sole right to damages, is constitutionally entitled to interest thereon from April 2, 1971. *Williams v. Me. Highway Commission, supra.*

■ We must next determine what *rate* of interest will be used to compute the total damages which the judgment will reflect.

At the time this taking was finalized (April 2, 1971), 9 M.R.S.A. § 228 provided:

"In the absence of an agreement in writing, the legal rate of interest is 6% a year."

Section 228, however, was repealed effective October 1, 1975. P.L.1975, ch. 500, § 891(8)(3). P.L.1975, ch. 500, § 432 (9–B M.R.S.A. § 432) now provides:

"The maximum legal rate of interest on a loan made by a financial institution, in the absence of an agreement in writ-

ing establishing a different rate, shall be 6 percent per year."

It is obvious, of course, that the amount of damages awarded in eminent domain cases cannot be construed to be "a loan made by a financial institution." Thus, we must address the question of whether the repeal of 9 M.R.S.A. § 228 would relieve the Authority of the obligation to pay interest subsequent to October 1, 1975, and, if not, what the rate of interest thereafter should be.

■■ The legal rate of interest in Maine has consistently been six percent since the origin of the State. Although the Revised Statutes of 1820 do not include a precise act establishing a legal rate of interest, P.L.1834, ch. 122, § 1 provided:

"That the legal rate of interest upon the loan or forbearance of any money, goods, or any kind of merchandize or things in action, shall *continue to be* six dollars upon one hundred dollars for one year, and at that rate for a greater or less sum, or for a longer or shorter time." (Emphasis supplied.)

Despite minor changes in phraseology, such remained the law until the Revised Statutes of 1871, ch. 45, § 1 became effective and this language was adopted:

"In the absence of any agreement in writing, the legal rate of interest shall be six per cent. by the year."

Since 1871 this statute has been retained in the successive revisions in this essential form until Section 228 was repealed in 1975.

As we have shown, until October 1, 1975, six percent per annum had been the legal interest rate. Thus, in eminent domain cases it has always been considered that the fair market value of the property taken with interest thereon at six percent was compatible with the concept of just compensation. This was true not *necessarily* because the "legal rate" of interest was six percent but *fundamentally* because

the payment of interest on the damages awarded in such cases was the constitutional obligation of a condemnor. Since in the past one hundred fifty years there has been no challenge to this interest rate as not reflecting the constitutional concept of "just compensation," we conclude that such rate is still appropriate.

## CONCLUSION

The precise issues agreed upon in the report were phrased as follows:

"A.  Did the City of Waterville have any compensable interest in the property in question on the date of filing with the Clerk of Courts as set forth in Paragraph I F on April 2, 1971?

B.  If the City of Waterville did have any interest under the instrument set forth in Paragraph I B on said April 2, 1971, what was the value of the interest of the City of Waterville and what was the value of the interest of the Plaintiff on that date, the total value of the property being $80,000.

C.  Under the pleadings and agreed statement of facts in this matter, must the Defendant, Waterville Urban Renewal Authority pay interest on the said sum of $80,000. If so, from what date and at what rate?"

Acting under the mandate of the report which was to "render such decision as the rights of the parties require," we answer the questions as follows:

Question A is answered in the negative.

Question B, in view of the answer to Question A, is moot.

Question C is answered in the affirmative, interest to be computed at the rate of six percent (6%) a year from April 2, 1971, to the date of judgment.

On the report it is, therefore, ordered that the case be remanded to the Superior Court for entry of judgment for the plaintiff in accordance with this opinion.

On the appeal by the City of Waterville the entry is:

Appeal denied.

All Justices concurring.