STATE OF MAINE                      BUSINESS AND CONSUMER COURT
CUMBERLAND, ss.                  DOCKET NO. BCD-CV-17-47

ANDROSCOGGIN SAVINGS BANK,    )
                                      )
    Plaintiff/Counterclaim-Defendant,     )
                                      )
            v.                     )     ORDER GRANTING IN PART AND
                                      )     DENYING IN PART PLAINTIFF'S
BARTON MORTGAGE CORP., et al.,     )     MOTION FOR PARTIAL SUMMARY
                                      )     JUDGMENT
    Defendants/Counterclaim-Plaintiffs.    )
                                      )

Plaintiff/Counterclaim-Defendant Androscoggin Savings Bank (the "Bank") has filed a motion for partial summary judgment. Defendants/Counterclaim-Plaintiffs Barton Mortgage Corporation and Deron Barton (collectively "Barton") oppose the motion. The Court heard oral argument on the motion on April 17, 2019. Both parties appeared through counsel. The Bank is represented by Melissa Hewey and Emily Howe of Drummond Woodsum and Barton is represented by John Campbell of Campbell & Associates.

## PROCEDURAL HISTORY

The Bank initiated this action on July 20, 2017 with a three count complaint (the "Complaint"). Barton responded on January 24, 2018, with an eighteen count counterclaim (the "Counterclaim"). Each count contained in the Complaint and the Counterclaim stems from a series of events arising out of a business relationship between the Bank and Barton that took place over several years. In February 2018, the Bank filed a partial motion to dismiss the Counterclaim, and on May 29, 2018, the Court issued an Order dismissing counts I, III, IV, VII, VIII, and XII of the Counterclaim. The Bank now moves for partial summary judgment pursuant to M.R. Civ. P. 56(c)

1

on counts I and II of its Complaint, (Pl.'s Compl. ¶¶ 17-26), as well as on the remaining counts II, V, VI, IX, X, XI, XIII, XIV, XV, XVI, XVII, and XVIII of Barton's Counterclaim. (Def.'s Countercl. ¶¶ 61-69, 77-83, 94-104, 111-145.) For the reasons set forth below, the Court grants the Bank summary judgment on counts I and II (liability only) of its Complaint, and on all but two of the remaining counts of the Counterclaim.

## FACTUAL BACKGROUND

The Bank is a Maine banking organization with a principal place of business located in Lewiston, Maine, and branches in Brunswick and Gray.[1] (Supp.'g S.M.F. ¶¶ 1-2.) Deron Barton founded Barton Mortgage Corporation in 2001 and has operated as a mortgage lender in Portland and Southern Maine. (Def.'s Add'l S.M.F. ¶¶ 4, 6.) As part of the mortgage lending business, Barton developed certain lending programs and procedures for generating a high-quality mortgage lending portfolio ("Barton's Portfolio Program"). (Def.'s Add'l S.M.F. ¶ 11.) In 2002, the Bank solicited Barton seeking to purchase loans that Barton had closed involving mortgages in Cumberland and York Counties because the Bank did not own a share of the mortgage market in either county. (Def.'s Add'l S.M.F. ¶¶ 6, 8.) Accordingly, Barton began selling loans to the Bank in 2002. (Def.'s Add'l S.M.F. ¶ 12; Supp.'g S.M.F. ¶ 7.)

In 2007 Paul Andersen ("Andersen") was the Executive Vice President, Chief Operating Officer at the Bank and expressed to Barton a desire to develop a more substantial business relationship – one where the two companies would mutually refer clients to each other.[2] (Def.'s Add'l S.M.F. ¶¶ 13, 17.) In order to facilitate this plan, Barton urged the Bank to generate a physical presence in Southern Maine because the relationship would otherwise not succeed.

---

[1] The Bank has since opened more branches; however, the timeline for this matter roughly begins in 2002 when the Bank only had branches as far south as Brunswick and Gray.

[2] Specifically, the parties contemplated that the Bank would purchase additional mortgages from Barton, and in return Barton would refer clients to the Bank for financial and investment services. (Def.'s Add'l S.M.F. ¶ 17.)

(Def.'s Add'l S.M.F. ¶ 12.) In 2009, the Bank announced that it was opening a new office branch in Portland, located at 130 Middle Street, which would be called the Business and Investment Center ("BIC").[3] (Def.'s Add'l S.M.F. ¶ 18.) Following this announcement, Andersen[4] and Barton met with several of the Bank's board members and the meeting culminated in a more comprehensive business relationship between the Bank and Barton: the Bank would purchase loans originated by Barton, refer its Cumberland and York County clients to Barton for mortgage loan services, and coordinate all future mortgage business through Barton; and Barton would refer his clients to the Bank for investment services, sign a lease and rent space from the Bank in the BIC for Barton's new office location (the "Lease"), and obtain a loan from the Bank to "fit-up" the rental space (the "Note").[5] (Def.'s Add'l S.M.F. ¶ 19.) The parties entered into the Lease, and Barton signed a Note in the principal amount of $110,000.[6] The details of the business arrangement, outside of the Lease and the Note, were not reduced to writing at that time. In December 2009, Barton took occupancy in the BIC in accordance with the Lease and used the proceeds from the loan to perform the "fit-up" of the office space contemplated under the Note.[7] (Def.'s Add'l S.M.F. ¶¶ 26-27.)

---

[3] During this time, Barton was actively looking to acquire new office space and had been engaged in conversations to buy an office condo located on Center Street. (Def.'s Add'l S.M.F. ¶ 28.)

[4] In 2009 Andersen became President of the Bank. (Def.'s Add'l S.M.F. ¶ 18.)

[5] According to Andersen, he wanted a positive business relationship with Barton and thought that he could achieve this goal, at least in part, by providing space at the BIC where the Bank and Barton could work together effectively. (Supp.'g S.M.F. ¶ 13.)

[6] In the Complaint and in Exhibit 2 accompanying the Complaint, the original principal amount is listed as $110,000; however, in the Bank's statement of material facts and in its first brief, the original principal amount under the Note is listed as $100,000. In its subsequent brief, the Bank explained the $100,000 amount was a scrivener's error. The Court finds that there is no genuine dispute, and that the principal amount of the Note is $110,000.

[7] Barton claims that, at the time he entered the Lease, he had the opportunity to purchase "on very favorable terms" an office condo on Center Street and that he opted to forgo this "valuable opportunity" in reliance on the business relationship with the Bank. (Def.'s Add'l S.M.F. ¶ 28.) Furthermore, Barton claims that, as a result of not taking advantage of that "valuable opportunity," he ended up incurring costs and forgoing the potential to generate equity in a difference office space. (Def.'s Add'l S.M.F. ¶ 29.)

In 2010, following the opening of the BIC, Andersen announced to the Bank's executive managers that the Bank and Barton would have a working business relationship and instructed all retail and development managers to begin referring all mortgage leads from the BIC to Barton. (Def.'s Add'l S.M.F. ¶ 30.) The Bank undertook joint marketing and advertising with Barton, and Andersen introduced Barton as the Bank's exclusive partner for residential lending in Southern Maine at a meeting with partners of Verrill Dana, LLP.[8] (Def.'s Add'l S.M.F. ¶ 31.) At the Bank's annual meeting in 2010, Barton was nominated and confirmed to be a corporator of the Bank and the Bank later issued a $3 million line of credit to Barton.[9] (Def.'s Add'l S.M.F. ¶¶ 23, 35.)

From 2010 into 2011, the Bank and Barton engaged in discussions about the Bank potentially buying a portion of Barton's business. (Def.'s Add'l S.M.F. ¶ 20.) On May 31, 2011, the Bank and Barton entered into a written agreement that provided for the sale and purchase of loans between the Bank and Barton (the "Correspondent Agreement").[10] (*See* Def.'s Add'l S.M.F. ¶ 24; Supp.'g S.M.F. ¶¶ 16, 19, 23, 26.) The first recital of the Correspondent Agreement states that the Agreement was "intended to set forth the entire understanding between the parties" regarding the sale and purchase of loans. (Pl.'s Ex. 10, ¶ 2.) The second recital to the Correspondent Agreement provides in pertinent part: "it being understood by both parties that this shall be non-exclusive Agreement." (Pl.'s Ex. 10, ¶ 3.) Section 10 of the Correspondent Agreement makes clear that the parties are independent contractors of each other and are not partners or joint venturers. (Pl.'s Ex. 10, § 10.) In July 2011, after the parties signed the Correspondent Agreement, Andersen

---

[8] Around this time, the Bank took the joint marketing campaign seriously enough to terminate a senior Vice President in marketing, Bill Denehy, for not adequately complying with it. (Def.'s Add'l S.M.F. ¶ 35.)

[9] The $3 million credit line was extended to Barton at some point in 2011. (Def.'s Add'l S.M.F. ¶ 35.)

[10] While Barton qualifies and denies the facts contained in Supp.'g S.M.F. ¶¶ 23, 26 with regard to the Correspondent Agreement, Barton admits the fact that the Correspondent Agreement was superseded by a later agreement. (Supp.'g S.M.F. ¶ 27.) Therefore, the Court treats the Correspondent Agreement as admitted by Barton.

recommended to the Bank's Board of Directors that the Bank not pursue buying a portion of Barton's business. (Pl.'s Reply to Def.'s Add'l S.M.F. ¶ 36; *see* Def.'s Add'l S.M.F. ¶¶ 36-38.)

After the Bank decided not to buy a portion of Barton's business, the Bank re-assigned management relations with Barton to Executive Vice President Chris Logan ("Logan"). (Def.'s Add'l S.M.F. ¶ 40.) Logan did not have any experience in mortgage lending, and, as a result of Logan's lack of experience, Senior Vice President for Mortgage Underwriting Bruce Winter ("Winter") resigned in 2012. (Def.'s Add'l S.M.F. ¶¶ 40-41.) Logan hired Joe Ferris ("Ferris") to replace Winter and to take over relations with Barton. (Def.'s Add'l S.M.F. ¶ 42.)

Ferris began to inquire about Barton's Portfolio Program and ask him to explain areas of his underwriting and pricing. (Def.'s Add'l S.M.F. ¶¶ 45, 47.) The Bank argues that "in order to effectively work with [the Bank], Ferris needed [sic] to know [Barton's] procedures and pricing." (Pl.'s Reply to Def.'s Add'l S.M.F. ¶ 45.) Barton responds that Ferris's inquiry was "deceitful" and "misleading" and that the goal was to "undermine" the business relationship. (Def.'s Add'l S.M.F. ¶ 45.) Ferris assured Barton that he would not use Barton's Portfolio Program except in connection with the business relationship between the Bank and Barton. (Def.'s Add'l S.M.F. ¶ 46.) Furthermore, Ferris assured Barton that the Bank would protect the confidentiality of the information that Barton was providing them. (Def.'s Add'l S.M.F. ¶ 48.)

On May 9, 2014, Barton saw an advertisement in the newspaper showing a Bank employee, Donna Miller ("Miller"), located at a desk in the BIC. (Def.'s Add'l S.M.F. ¶ 49.) Miller was employed as a mortgage lender.[11] (Def.'s Add'l S.M.F. ¶ 49.) Later that year, Barton learned that

---

[11] This was not the first time that Barton had become aware that the Bank might have been acting contrary to his understanding of their business relationship. Specifically, William Mann ("Mann"), who was the Vice President of Business and Government Services for the Bank from 2008 through 2009 and ceased working for the Bank in 2010 and began working for Barton, testified that, notwithstanding Andersen's instructions that Barton would be the Bank's mortgage in Southern Maine, when Andersen was not around, Logan gave the Bank's employees contrary instructions. (Supp.'g S.M.F. ¶¶ 41-44.) In Mann's view, "there was a diametric difference of what the top of the country [sic] was telling and what the operational level of the company was doing." (Supp.'g S.M.F. ¶ 45.)

5

the Bank was opening up a Third Party Lending program that would be used to purchase mortgage loans. (Def.'s Add'l S.M.F. ¶ 51.) Barton immediately objected to the Bank's commencing this program by calling Logan and Andersen, but was ignored. (Def.'s Add'l S.M.F. ¶ 54.) At all times, Barton continued to make referrals to the Bank in accordance with his understanding of their business arrangement. (Def.'s Add'l S.M.F. ¶ 57.)

The Bank subsequently hired loan officers in the BIC and also opened a second Cumberland County location in Scarborough with a full-service mortgage origination staff. (Def.'s Add'l S.M.F. ¶¶ 58, 61.) According to Barton, the Bank was using Barton's Portfolio Program in connection with their new mortgage lending program. (Def.'s Add'l S.M.F. ¶ 58.) According to Logan, the Bank had "always had in place underwriting guidelines" since he began his tenure and that the Bank "amended the guidelines during [his] tenure but [does] not recall ever seeing any written guidelines developed by [Barton]." (Logan Aff. ¶ 4.) The Bank had been referring loans to entities other than Barton, including its own offices in Lewiston. (Def.'s Add'l S.M.F. ¶ 64; Pl.'s Reply to Def.'s Add'l S.M.F. ¶ 64.) Barton was notified on November 30, 2015 that the Bank would be terminating Barton's line of credit, which at the time was Barton's primary source of money for closing loans. (Def.'s Add'l S.M.F. ¶¶ 69-70; Pl.'s Reply to Def.'s Add'l S.M.F. ¶ 69.) Thereafter, Barton obtained a line of credit from Machias Savings Bank ("Machias"), which was used to fund Barton's loans, and continued to sell loans to the Bank.[12] (Supp.'g S.M.F. ¶¶ 31-32.)

In January 2016, Ferris informed Barton that the Bank would no longer purchase loans from him unless he executed a new contract with them. (Def.'s Add'l S.M.F. ¶ 73.) The parties

---

[12] Counterclaim Count XVIII arises from the communication that Logan had with Machias after Barton obtained the line of credit from Machias. (Def.'s Countercl. ¶¶ 138-145.) The Bank claims that Logan had one conversation with Machias about Barton, regarding a loan brokered by Barton that was funded by Machias and was being bought by the Bank. (Supp.'g S.M.F. ¶ 72.) This conversation, the Bank claims, was to confirm with Machias that Machias had prepared the paperwork that Barton presented to the Bank. (Supp.'g S.M.F. ¶¶ 72-74.) Barton disputes Logan's intention for contacting Machias, claiming that Logan's intent was malicious, Opp. S.M.F. ¶¶ 72-75; however, Barton fails to separately raise these factual assertions in his statement of additional facts.

entered into a new, but similar, agreement, which defined and structured the loan purchasing process between the Bank and Barton, and described the method for Barton's compensation (the "Mortgage Loan Purchase Agreement"). (Supp.'g S.M.F. ¶¶ 27, 29.) The Mortgage Loan Purchase Agreement superseded the Correspondent Agreement. (Supp.'g S.M.F. ¶ 27.) Like with the Correspondent Agreement, according to the first recital of the Mortgage Loan Purchase Agreement, the Agreement was "intended to set forth the entire understanding between the parties" regarding the purchase and sale of loans. (Pl.'s Ex. 27, ¶ 2.) The second recital to the Mortgage Loan Purchase Agreement provides in pertinent part: "it being understood by both parties that this shall be non-exclusive Agreement." (Pl.'s Ex. 27, ¶ 3.) Section 11 of the Mortgage Loan Purchase Agreement provides in pertinent part that: "Nothing contained herein shall constitute a partnership or joint venture between Androscoggin Bank and Lender, and the parties acknowledge that at all times they are operating as independent contractors." (Pl.'s Ex. 27, § 11.) Section 16 of the Mortgage Loan Purchase Agreement provides in pertinent part that: "This Agreement takes precedence over and supersedes all other and prior agreements or understandings between Lender and Androscoggin Bank, whether or not in writing, with respect to its subject matter. All transactions between the parties within the subject matter of this Agreement subsequent to the date of this Agreement are to be governed by the terms of this Agreement." (Pl.'s Ex. 27, § 16.) The parties signed the Mortgage Loan Purchase Agreement on February 26, 2016, with an effective date of February 25, 2016. (Supp.'g S.M.F. ¶ 27.)

Barton later determined that he could no longer successfully operate his business while located in the BIC because of the Bank openly competing against him in the same location. (Def.'s Add'l S.M.F. ¶ 81.) Barton ceased making payments pursuant to the Lease after January 2017, and vacated the leased premises in the BIC by June 2017. (Supp.'g S.M.F. ¶ 47.) At the time of his

departure, Barton owed the Bank four months of rent. (*See* Supp.'g S.M.F. ¶ 37.) As of February 2017, Barton also stopped making payments on the Note, leaving unpaid principal in the amount of $30,195.35. (*See* Supp.'g S.M.F. ¶ 35.) On July 23, 2017, the Bank instructed Bert Gosselin ("Gosselin"), the Bank's facilities manager, to clean out the space formerly occupied by Barton under the Lease. (Supp.'g S.M.F. ¶ 49.) Gosselin and Michael DiLodovico ("DiLodovico"), Gosselin's subordinate, subsequently packed up all of Barton's files and documents in sealed boxes and brought the boxes to the record retention room at the Bank's headquarters in Lewiston for storage.[13] (Supp.'g S.M.F. ¶¶ 50-51.)

## STANDARD OF REVIEW

Summary judgment is granted to a moving party where "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law." M.R. Civ. P. 56(c). "A material fact is one that can affect the outcome of the case, and there is a genuine issue when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CityMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation omitted). A genuine issue exists where the jury would be required to "choose between competing versions of the truth." *MP Assocs. v. Liberty*, 2001 ME 22, ¶ 12, 771 A.2d 1040. "Where a plaintiff will have the burden of proof on an essential issue at trial, and it is clear that the defendant would be entitled to a judgment as a matter of law at trial if the plaintiff presented nothing more than was before the court at the hearing on the motion for a summary judgment, the court may properly grant a defendant's motion for a summary judgment." *Champagne v. Mid-Maine Med. Ctr.*, 1998

---

[13] Barton, in his response to the Bank's factual assertion in paragraph 50, claims that Barton learned of other files having been dumped into a dumpster. (Opp. S.M.F. ¶ 50.) However, because Barton's response asserts new facts and he failed to set forth those new facts in his separate section of additional facts, the Court will not propound the new facts contained in Barton's response to paragraph 50. *Doyle v. Dept. of Human Servs.*, 2003 ME 61, ¶ 11, 824 A.2d 48; *Burbank v. Davis*, 227 F. Supp. 2d 176, 179 (D. Me. 2002) (explaining that to the extent that responses to a statement of material facts are additional facts cloaked as facts that rebut or qualify those statements of material fact, the Court need not consider them).

8

ME 87, ¶ 9, 711 A.2d 842. "To avoid a judgment as a matter of law for a defendant, a plaintiff must establish a prima facie case for each element of her cause of action." *Id.* "Summary judgment is no longer an extreme remedy." *Curtis v. Porter*, 2001 ME 158, ¶ 7, 784 A.2d 18.

## DISCUSSION

I.      Count I – Bank's Claim for Default under the Note

Count I alleges that Barton is in default under the Note because Barton executed the Note in favor of the Bank, and Barton stopped making payments on the Note before paying off the principal.  Specifically, the Bank argues that Barton ceased making payments on the Note since February 2017, and Barton's non-payment constitutes a default under the terms of the Note. Barton does not dispute that he stopped making payments without paying off the principal, but instead argues: (1) the Bank failed to properly make record citations or authenticate records in support of its claim; (2) the Bank's statements of fact do not establish that a "default" existed; and (3) the Bank's alleged misconduct excused Barton's payment obligations under the Note. The Court, however, is not persuaded by Barton's arguments and, as a result, grants summary judgment in favor of the Bank on Count I.

It is undisputed that Barton executed the Note in the principal amount of $110,000 in favor of the Bank.[14] It is also undisputed that Barton failed to make payments on the note since February, 2017, and that there remains unpaid principal in the amount of $30,195.35. The terms of the Note state that a default occurs upon the borrower's "failure to make any payment on time or in the amount due," and so the Bank has established that a default occurred.  Barton's argument that its non-payment is excused by the Bank's allegedly wrongful conduct with regard to their overall

---

[14] Barton admitted in his pleadings that he executed the Note in favor of the Bank. (Pl.'s Compl. ¶ 10; Def.'s Ans. ¶ 10); *see Bahre v. Liberty Group, Inc.*, 2000 ME 75, ¶ 15, 750 A.2d 558 (stating that a party's assertion of fact in a pleading, including an admission of fact through an answer, is a judicial admission by which it normally is bound throughout the course of the proceeding).

9

business relationship has no legal basis. Barton has not provided any authority for the Court to declare a breach of a promissory note based on unrelated wrongful conduct that is not contemplated thereunder. Furthermore, the Note is clear in its terms and explicitly sets forth the expectations of the parties. Therefore, Barton is liable to the Bank under the Note, and the Court grants summary judgment in favor of the Bank on Count I in the amount of $30,195.35, plus interest and attorney fees.[15]

## II.    Count II – Bank's Claim for Default under on the Lease

Count II alleges that Barton is in default under the Lease because Barton has not complied with its payment obligations in accordance with the terms of the Lease and, therefore, Barton is liable to the Bank for unpaid rent. Barton makes basically the same arguments as set forth in the Court's discussion of Count I. For the same reasons, the Court is unpersuaded by Barton's arguments, and grants summary judgment in favor of the Bank on Count II.

It is undisputed that Barton executed the Lease in favor of the Bank.[16] It is also undisputed that Barton failed to make any payments under the Lease since January 2017. Under the terms of the Lease, if Barton does not make the requisite payment amount when rent is due, this constitutes an event of default, which renders Barton liable for the unpaid sums. As discussed under Count I, Barton's argument that its non-payment should be excused due to the Bank's unrelated but allegedly wrongful conduct is unpersuasive. Therefore, Barton is liable to the Bank under the Lease and the Court grants summary judgment in favor of the Bank on Count II with regard to liability.  However, the Bank did not establish by affidavit or otherwise the exact amount of rent due, so the damages phase of Count II will be heard during the final hearing in this matter.

## III.    Counterclaim Count II – Barton's Claim for Misrepresentation and Concealment

---

[15] Counsel for the Bank can provide the interest amount, and seek an award of a specific attorney fees amount, by affidavit or at the final hearing in this matter.
[16] Barton admitted in his pleadings that he executed the Lease. (Pl.'s Compl. ¶ 4; Def.'s Ans. ¶ 4.)

Counterclaim Count II alleges that, by virtue of the business relationship between the parties, the Bank owed to Barton a legal or common law duty of good faith, loyalty, and a duty of full disclosure, and that the Bank breached these duties by misrepresenting facts to Barton and concealing its true intent in the course of business in which the Bank had a pecuniary interest in order to negligently or fraudulently induce Barton to act in reliance thereon.[17] Specifically, Barton, in arguing that there are genuine disputes of material fact with regard to Counterclaim Count II, states that the Bank made numerous false statements when it repeatedly assured Barton throughout the course of their business relationship that it was going to exclusively refer its mortgage loans to Barton and when it assured Barton that the Barton Portfolio Program would be used exclusively to promote their mutual referral business relationship. The Bank, however, argues that there was never a misrepresentation of a material fact, because Andersen was being truthful when he gave Barton his original assurance that the Bank would refer customers exclusively to Barton, and that, even if there was a misrepresentation, Barton unjustifiably relied on it. The Court agrees with Barton that there is a genuine dispute of material fact and, therefore, must deny the Bank's motion for summary judgment on Counterclaim Count II.

To succeed on an intentional misrepresentation claim, a claimant must establish that the defendant:

> [made] a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance on it, and (5) the other person justifiably relies on the representation as true and acts upon it to the damage of the plaintiff.

---

[17] Counterclaim Count II alleges misrepresentation broadly, which the Court interprets as a claim for both intentional misrepresentation and negligent misrepresentation. Accordingly, the Court will address both theories of liability in this section.

*Drilling & Blasting Rock Specialists, Inc. v. Rheaume*, 2016 ME 131, ¶ 17, 147 A.3d 824. "A plaintiff may justifiably rely on the fraudulent misrepresentation of a defendant, whether made intentionally or recklessly, without investigating the truth or falsity of the representation." *Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979). "Reliance is unjustified only if the plaintiff knows the representation is false or its falsity is obvious to him." *Id.* To succeed on a negligent misrepresentation claim, a claimant must establish that:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) Torts § 552(a)(1); *see Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990) (adopting section 552(a)(1) of the Restatement as the appropriate standard for negligent misrepresentation claims).

Here, Barton provides prima facie evidence of both an intentional and negligent misrepresentation claim and has raised issues of material fact that must be resolved by the fact-finder. In regards to his intentional misrepresentation claim, Barton makes factual assertions sufficient, at this stage in the litigation, to survive summary judgment by establishing a prima facie case for each element.[18] Barton asserts that (1) the Bank, through Andersen and other employees, misrepresented that, (2) Barton would be the exclusive face of the Bank's Southern Maine mortgage services, (3) the Bank knew this to be false, acted in reckless disregard of whether it was true or false, or acted negligently (4) the Bank made these assurances in order to induce Barton to

---

[18] Barton has provided evidence of this primarily through his affidavit, which is based upon his personal knowledge, observations, and opponent party statements.

continue doing business with it, and (5) Barton justifiably relied on these assurances and it resulted in him losing business.

The Bank, in response, states that there was only one representation that was given to Barton: the assurance that Andersen gave Barton in 2009 or 2010 that Andersen wanted the Bank and Barton to have a mutually beneficial referral relationship with each other and that the Bank would refer all mortgage leads to Barton that it received from the BIC. This assurance, the Bank argues, is not actionable as an intentional misrepresentation because the assurance was premised upon future intention, rather than of past or existing fact, and subject to the statute of limitations. The Bank, however, fails to address the assurances that were repeatedly made to Barton by Bank employees throughout the course of their business relationship, which would constitute assurances of existing fact, some of which occurred within the limitations period. For example, Barton asserts that he confronted Ferris in 2014 in connection with a Bank ad that depicted a mortgage lender at the BIC and Ferris assured him that this was just a short-term arrangement and had no impact on the relationship between the parties. These assurances that were given over the course of this matter are material to Barton's misrepresentation claim and, because Barton properly establishes a prima facie case for misrepresentation and has challenged the Bank's version of the truth with regard to these assurances, there is a genuine dispute of material fact.

There is also a dispute of material fact as to whether Barton was justified in relying on the Bank's assurances. The Bank argues that Barton was not justified in relying on these assurances because he knew that they were false. Specifically, they argue that Mann, who had previously worked at the Bank and subsequently went to work for Barton, knew these assurances were false and informed Barton to that effect. Barton, however, states that he believed the Bank was being truthful to him, for example, when assurances were made to third parties that Barton was the

Bank's exclusive partner for residential lending in Southern Maine and believed that Bank employees, such as Ferris, had the authority to ensure that these assurances would be upheld. In addition, even if the Court were to accept the Bank's argument with regard to Barton's knowledge of falsity, there still would be a genuine dispute of material fact as to *when* Barton became aware that the Bank's assurances were false. In other words, there would be a gap in time between when Barton was given an assurance by the Bank and when Barton found out about its falsity, which leaves a gap in time where other assurances may have been made and justifiably relied upon. Similarly, the Bank may have also been truthful with its assurances in the beginning of its relationship with Barton, but over time began reneging on them. This would also create a gap in the timeline of when the intentional misrepresentation, if any, occurred.

Lastly, the Bank argues that the existence of the Correspondent Agreement and the Mortgage Loan Purchase Agreement preclude Barton from justifiably relying upon the Bank's assurances because the agreements provide that the relationship between the Bank and Barton was non-exclusive. However, as Barton argues, the Bank still made assurances in contradiction to the agreements and, as a result, there is a factual dispute as to whether Barton was justified in relying on the Bank's verbal assurances over the written terms of the agreements. Accordingly, because a genuine dispute of material fact exists with regard to Barton's misrepresentation claims, the Court denies summary judgment on Counterclaim Count II.

IV.    <u>Counterclaim Count V – Barton's Claim for Tortious Interference with Advantageous Relations</u>

Counterclaim Count V alleges that the Bank interfered, through fraud or intimidation, with Barton's potential contractual and advantageous relations. Specifically, Barton argues that in an effort to interfere with other opportunities that Barton had for partnering, the Bank made false statements to third parties that Barton would be the Bank's exclusive partner for residential lending

14

in Southern Maine, and also interfered when Ferris misrepresented to Barton that Barton's Portfolio Program would be used exclusively to promote their business relationship and that the information would be kept confidential. The Bank argues that, in addition to the absence of fraud and being time-barred as argued under the Counterclaim Count II, Barton has failed to set forth evidence of any contract or prospective contract with a third party and, thus, cannot succeed in opposing summary judgment on this count. The Court concludes that Barton failed to demonstrate the causal connection between the Bank's alleged fraud or intimidation and any of Barton's potentially advantageous relationships and, therefore, must grant summary judgment in favor of the Bank on Counterclaim Count V.

To succeed on a tortious interference claim, a claimant must establish: "(1) the existence of a valid contract or prospective economic advantage; (2) interference with that contract or advantage through fraud or intimidation; and (3) damages proximately caused by the interference." *Gordan v. Cummings*, 2000 ME 68, ¶ 14, 756 A.2d 942 (quotation marks omitted). Therefore, in order to survive the Bank's motion for summary judgment, Barton had to establish a prima facie case for each of the above listed elements. However, Barton has failed to meet his burden on this count.

Barton's legal theory hinges upon economic opportunities that he had in 2009 and 2010. Specifically, Barton argues that in 2009, at the time he took occupancy on the leased premises, he had the opportunity to purchase an office condo on favorable terms at a different location, and that in 2010, Barton had the opportunity to partner with several other local banks. Instead of pursuing those opportunities, Barton argues, he opted to forgo them in favor of the Bank.

The Court need not focus on fraud or intimidation here because the fatal flaw with Barton's tortious interference claim is that there is a disconnect between when these economic opportunities

15

arose and when the Bank's alleged wrongdoing occurred. In other words, Barton has not set forth prima facie evidence of causation. Even assuming arguendo that the Bank did engage in fraud or intimidation, Barton did not assert as fact that the fraud occurred in connection with, or at the same time as, these prospective opportunities, nor did he assert that it was the intention of the Bank to interfere with them. In his brief, Barton stated that the alleged misrepresentations began in 2012, which was two years after he had forgone these other opportunities. Therefore, Barton has failed to meet his burden of establish a prima facie case for tortious interference with advantageous relationships. Accordingly, the Court grants summary judgment in favor of the Bank on Counterclaim Count V.

V. Counterclaim Count VI – Barton's Claim for Negligent Infliction of Emotional Distress

Counterclaim Count VI alleges that the Bank took actions that ordinary, careful people or businesses would not take and failed to use ordinary care when it breached its duties owed to Barton, and that it was a reasonably foreseeable result of the Bank's conduct that Barton would suffer severe emotional distress as a result of the Bank's breach, and that Barton did, in fact, suffer serious emotional distress as a result of the Bank's breach of its duties owed to Barton. Specifically, Barton argues in his brief that a jury could reasonably find that the Bank would be liable under this theory because the Bank engaged in deceitful actions that went to the heart of Barton's livelihood and his entire life's work, affecting his and his family's security and well-being, when the Bank agreed to "partner" with Barton and then proceeded to take advantage of Barton by not holding up to its end of the business relationship. The Bank, however, argues that Barton has not met his burden on summary judgment as the non-moving plaintiff because he failed to state facts establishing that Barton suffered emotional distress and has not shown that the requisite special relationship existed between the Bank and Barton that would give rise to liability under this legal

16

theory. The Court agrees with the Bank and grants summary judgment in favor of the Bank on Counterclaim Count VI.

To succeed on a negligent infliction of emotional distress claim, a claimant must establish: "(1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was harmed; and (4) the breach caused the plaintiff's harm.[19]" *Curtis*, 2001 ME 158, ¶ 18, 784 A.2d 18. "Plaintiffs claiming negligent infliction, however, face a significant hurdle in establishing the requisite duty, in great part because the determination of duty in these circumstances is not generated by traditional concepts of foreseeability." *Id.* This duty to act reasonably to avoid emotional harm to others has been recognized in very limited circumstances: "first, in claims commonly referred to as bystander liability actions; and second, in circumstances in which a special relationship exists between the actor and the person emotionally harmed." *Id.* ¶ 19; *see* Restatement (Second) Torts § 46 (providing illustrations of when liability arises in a claim for negligent infliction of emotional distress). Furthermore, there are some instances where recovery for emotional harm caused by a separate tort is not permitted, such as negligent misrepresentation claims, because recovery for misrepresentation is limited to pecuniary harm. *Id.*; *Jourdain v. Dineen*, 527 A.2d 1304, 1307 (Me. 1987).[20]

Even though Barton is the non-movant in this action for summary judgment, he is still the counterclaim-plaintiff on this claim and, therefore, carries with him the burden on summary judgment of making factual assertions sufficient to establish a prima facie case for each element of his claim. Here, Barton has failed to assert facts establishing: first, a special relationship that

---

[19] Not only must the claimant prove that they have been harmed, but the claimant must prove that the harm incurred was severe emotional distress. *Id.* ¶ 20.

[20] "To establish a defendant's duty for purposes of a separate claim of negligent infliction of emotional distress, the plaintiff must do more than show that the emotional harm was foreseeable . . . [t]he plaintiff must additionally show that public policy favors the recognition of a legal duty to refrain from inflicting emotional injury, based upon plaintiff's status or relationship between the parties." *Veilleux v. Nat'l Broad. Co.*, 206 F.3d 92, 130 (1st Cir. 2000).

would warrant placing a duty on the Bank to act reasonably to avoid emotional harm to Barton; and second, that Barton suffered severe emotional distress. By failing to assert facts necessary to establish a prima facie case for negligent infliction of emotional distress, the claim must necessarily fail.

Furthermore, even if Barton had established these facts, the Court would still grant summary judgment in favor of the Bank on Counterclaim Count VI because the business relationship between the Bank and Barton does not constitute the special type of relationship necessary for a negligent infliction claim. First, there exists no case law that has held that a mutually beneficial referral relationship is the type of special relationship that would give rise to liability under a theory of negligent infliction of emotional distress. Courts have long been reluctant to broaden the scope of such special relationships beyond narrow constraints, *e.g.*, *Berry v. Worldwide Language Res., Inc.*, 716 F. Supp. 2d 34, 51 (D. Me. 2010), and, when a court has found such a special relationship, the circumstances giving rise to it are carefully carved out and properly limited by the court. Mutually beneficial referral relationships are common in the business world and serve as a regular way of conducting business. This is exactly the opposite of the type of special relationship that Maine law has held gives rise to the requisite duty under a negligent infliction of emotional distress claim.

Finally, Barton is precluded from succeeding on Counterclaim Count VI because recovery is not permitted when the emotional distress is premised upon a claim of misrepresentation. Here, Barton's claim for negligent infliction of emotional distress stems from the same facts that support Counterclaim Count II. Recovery under a claim for negligent misrepresentation is limited to pecuniary harm. This runs counter to recovery for negligent infliction of emotional distress, which, if successful, allows the plaintiff to recover for the harm caused to the plaintiff's emotional health.

18

*Curtis*, 2001 ME 158, ¶ 19, 784 A.2d 18. Plaintiffs such as Barton are not permitted to circumvent the restriction placed upon claims for negligent misrepresentation by alleging negligent infliction in addition to the separate negligent misrepresentation claim. *Id.*

VI.     Counterclaim Count IX – Barton's Claim for Quantum Meruit

Counterclaim Count IX alleges that Barton provided services and/or materials to the Bank, with its knowledge and consent, and that, under the circumstances, it was reasonable for Barton to expect payment from the Bank. The Bank argues that the existence of the Correspondent Agreement and the Mortgage Loan Purchase Agreement preclude Barton's claim for quantum meruit and that Barton did, in fact, receive just compensation for his loan referrals. The Court concludes that Barton was paid for the services he rendered to the Bank, thus fulfilling the Bank's obligation to Barton, and grants summary judgment in favor of the Bank on Counterclaim Count IX.

To succeed on a claim for quantum meruit, the claimant must establish: that "(1) services were rendered to the defendant by the plaintiff; (2) with the knowledge and consent of the defendant; and (3) under circumstances that make it reasonable for the plaintiff to expect payment." *Paffhausen v. Balano*, 1998 ME 47, ¶ 8, 708 A.2d 269. "There must be a reasonable expectation on the part of the claimant to receive compensation for his services and a concurrent intention of the other party to compensate him." *Id.* ¶ 9 (quotation marks omitted). Here, Barton *was* compensated for the referral of leads and services he rendered to the Bank. Under both the Correspondent Agreement and the Mortgage Loan Purchase Agreement, the Bank was obligated to pay Barton a certain fee for each loan that it purchased from Barton. Nothing in the record suggests that the Bank did not abide by the terms of either agreement and, from the Court's perspective, the Bank fully compensated Barton for each loan that it purchased. Because Barton

was compensated for his services, the Court grants summary judgment in favor of the Bank on Counterclaim Count IX.

VII. Counterclaim Count X – Barton's Claim for Unjust Enrichment

Counterclaim Count X alleges that Barton suffered damages due to the inequitable retention of benefits obtained by the Bank from Barton and that, as a result, Barton is entitled to recover from the Bank under the theory of unjust enrichment. The Bank argues that Barton's claim is precluded by the existence of the Correspondent Agreement and the Mortgage Loan Purchase Agreement. The Court concludes that Barton's claim for unjust enrichment is precluded by the existence of these agreements and, therefore grants summary judgment in favor of the Bank on Counterclaim Count X.

"Unjust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Paffhausen v. Balano*, 1998 ME 47, ¶ 6, 708 A.2d 269. To succeed on a claim for unjust enrichment, a claimant must establish that: "(1) it conferred a benefit on the other party; (2) the other party had appreciation of knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185. "The existence of a contractual relationship between the parties that addresses the sums in dispute precludes recovery on a theory of unjust enrichment." *Knope v. Green Tree Servicing, LLC*, 2017 ME 95, ¶ 13, 161 A.3d 696. "The rationale behind this rule is that courts should not intervene to redefine rights and obligations that parties have already defined for themselves through a voluntary contract." *Id.*

Here, the Bank and Barton entered into two contracts, the Correspondent Agreement and the Mortgage Loan Purchase Agreement, that provided the compensation structure for Barton's

20

referral of loans to the Bank. These agreements were bargained for and voluntarily entered into by each party. Barton was free to negotiate with the Bank to include additional compensation for his services, but he failed to do so. As stated in *Knope*, the Court will not intervene to redefine the rights of parties that have been defined through a voluntarily contract. Accordingly, the Court concludes that Barton's claim for unjust enrichment is precluded by the existence of these agreements, and grants summary judgment in favor of the Bank on Counterclaim Count X.

VIII.    Counterclaim Count XI – Barton's Claim for Trespass to Chattels

Counterclaim Count XI alleges that the Bank is liable for entering the leased premises that Barton occupied at the BIC and removing and destroying Barton's valuable papers without authorization from Barton to do so, and that, as a result of the unauthorized entry, the Bank caused damage to Barton. The Bank argues that Barton had vacated the leased premises, which effectively terminated the Lease and, per the terms of the Lease, entitled the Bank to remove, store, dispose of, or move Barton's property and treat the property as if it had been conveyed to the Bank. The Court concludes that Barton has not established a prima facie case of trespass to chattels, and therefore grants summary judgment in favor of the Bank on Counterclaim Count XI.

To succeed on a claim for trespass to chattels, a claimant must establish that "one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *Pearl Inv. LLC v. Standard I/O, Inc.*, 257 F. Supp. 2d 326, 354 (D. Me. 2003). Here, Barton misunderstands his burden on summary judgment as the non-moving plaintiff and, as a result, his claim for trespass to chattels must necessarily fail. Barton has failed to set forth *any* facts in support of this claim. Instead, Barton seems to rely on the strategy of simply disputing the Bank's statements of material fact in order to survive the Bank's motion.

While it is true that nothing in Rule 56 places an obligation on the non-moving party to assert additional material facts, *Burbank*, 227 F. Supp. 2d 176, 179 (D. Me. 2002), when, as here,

21

"a defendant moves for summary judgment, the plaintiff must establish a prima facie case for each element of her cause of action." *Champagne*, 1998 ME 87, ¶ 9, 711 A.2d 842. The proper way to establish a prima facie case as the non-moving plaintiff would be through a statement of additional facts, rather than through responding to the moving party's statement of material facts, because a Court need not consider additional facts when they are improperly commingled in responsive paragraphs. This is precisely what Barton attempted to do with regard to his trespass to chattels claim.

While the Bank properly asserted facts defending against the trespass to chattels claim, Barton failed to make any assertions of fact in his statement of additional facts that would establish a prima facie case for trespass to chattels. Instead, Barton only responds to the Banks factual assertions in his opposing statement of material facts by qualifying the Bank's statements of fact and attempting to introduce additional facts through his response. This is an improper way of attempting to introduce additional facts and will not suffice to establish a prima facie case for trespass to chattels. *See Doyle*, 2003 ME 61, ¶ 11, 824 A.2d 48. Therefore, because Barton has failed to meet his burden of establishing a prima facie case for trespass to chattels. The Court grants summary judgment in favor of the Bank on Counterclaim Count XI.

IX.     Counterclaim Count XIII – Barton's Claim for Conversion and Interference with Chattels

Counterclaim Count XIII alleges that Barton was intentionally dispossessed of his personal property when the Bank intentionally and wrongfully took possession of, and exercised dominion and control over, the personal property of Barton and, as a result of the Bank's conversion and its unreasonable interference with chattels, Barton suffered damages. Specifically, Barton argues that the Bank made no attempt to follow Maine's Abandoned Property statute before disposing of Barton's property after Barton vacated the leased premises, and that the Bank deprived Barton of

the value of files and other property when Bank employees packed up and moved this property to its Lewiston office. The Bank argues that Barton had abandoned the leased premises, which effectively terminated the tenancy, and per the terms of the Lease, entitled the Bank to remove, store, dispose of, or move Barton's property and treat the property as if it had been conveyed to the Bank. The Court concludes that Barton has not established a prima facie case of conversion, and therefore grants summary judgment in favor of the Bank on Counterclaim Count XIII.

To succeed on a claim for conversion, the claimant must establish: "(1) the person claiming that his or her property was converted has a property interest in the property; (2) the person had the right to possession at the time of the alleged conversion; and (3) the party with the right to possession made a demand for its return that was denied by the holder." *Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769 (internal quotation marks omitted). As discussed above, Barton, as the non-moving plaintiff, has the burden of establishing a prima facie case of conversion in order to survive the Bank's motion. Barton, however, has not met his burden because he has failed entirely to affirmatively state *any* facts pertaining to this claim. Instead, he relies upon creating a dispute of material fact by denying the bulk of the Bank's statement of material facts with regard to this claim. In doing so, Barton disregarded his burden and, as a result, the Court grants summary judgment in favor of the Bank on Counterclaim Count XIII.

X.      Counterclaim Count XIV – Barton's Claim for Negligence

Counterclaim Count XIV alleges that the Bank owed Barton a duty of care, under both common law and 14 M.R.S. § 6013, with regard to Barton's personal property at the leased premises in the BIC and the Bank breached that duty, which resulted in the loss of Barton's property. The Bank makes the same arguments as made in Counterclaim Counts XI and XIII. For the same reasons discussed above, the Court concludes that Barton has failed to meet his burden

23

of establishing a prima facie case of negligence. The Court grants summary judgment in favor of the Bank on Counterclaim Count XIV.

XI.     Counterclaim Count XV – Barton's Claim for Punitive Damages

Counterclaim Count XV alleges that the Bank acted deliberately, recklessly, and maliciously with regard to the business interests of Barton and that this conduct was sufficiently outrageous to demonstrate malice towards Barton, which would warrant liability for punitive damages. Specifically, Barton argues that a reasonable jury could find that the Bank acted deliberately and with actual or implied malice with regard to its actions in trespassing, disregarding property rights, and tormenting and embarrassing Barton and cutting off Barton's credit in order to put him out of business for the Bank's own competitive advantage. The Bank, however, argues that a claim for punitive damages is not a separate cause of action under Maine Law, thus making Counterclaim Count XV improper, and that Barton has failed to show that the Bank acted with malice. Accordingly, the Court concludes that Barton has failed to make a showing of malice, whether actual or implied, on behalf of the Bank and, thus, the Court must grant summary judgment in favor of the Bank on Counterclaim Count XV.

While the Bank is correct that punitive damages are not a separate cause of action, "pleading punitive damages separately is common practice to put parties and the court on notice of the damage claim." *Murray v. Murray*, No. CV-05-161, 2006 Me. Super. LEXIS 259, at *10-11 (Dec. 13, 2006). Accordingly, the Court is not persuaded by the Bank's procedural argument. The substantive argument that the Bank makes, however, is persuasive. To succeed in receiving an award for punitive damages, the plaintiff must "prove by clear and convincing evidence that the defendant acted with either express or implied malice." *Tuttle v. Raymond*, 494 A.2d 1353, 1363-1364 (Me. 1985). "Malice is proven by evidence that a party acted with ill will toward the plaintiff or that the conduct was so outrageous that malice can be implied; it is not established by

a mere reckless disregard of the circumstances." *Morgan v. Kooistra*, 2008 ME 26, ¶ 29, 941 A.2d 447.

Here, Barton has failed to make a satisfactory showing of malice in support of his request for punitive damages. Barton sought to show malice on behalf of the Bank by providing evidence of the Bank's contradictory actions and statements regarding its business relationship with Barton. This evidence, at best, may show that the Bank made misrepresentations, but not that the Bank acted with malice.[21]

The facts before the Court demonstrate a genuine dispute about whether the Bank gave Barton contradicting statements about its business practice of referring loans to Barton and that, after the Bank had developed its own loan origination and service capabilities, it decided to terminate Barton's line of credit and move in a different business direction with less involvement of Barton. Barton has not provided any factual basis for concluding that the Bank acted with ill will towards Barton or with the intent to harm him or put him out of business. Under these circumstances, allowing the claim for punitive damages to survive would go against the Law Court's rationale behind applying the malice standard to punitive damages. *See Tuttle*, 494 A.2d at 1361, 1363 ("A standard that allows exemplary awards based upon gross negligence or mere reckless disregard of the circumstances overextends the availability of punitive damages, and dulls the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct." "[T]he primary concern of the doctrine of punitive damages is to deter misconduct, not to benefit plaintiffs").

With regard to Barton's line of credit, the Bank was within its rights to terminate it, and did so with proper notice. Barton has not offered any credible evidence that the Bank's decision to

---

[21] The Court does not consider the Bank's actions or statements relating to Barton's property and trespass claims because Barton has failed to assert any facts supporting those claims.

do so was an act of malice, or even a deliberate attempt to try and put Barton out of business. Furthermore, the line of credit that Barton received from the Bank was *not* essential to Barton's business, as evidenced by Barton's ability to secure a line of credit from Machias.[22] In sum, Barton has not made the requisite showing of malice in connection with his request for punitive damages. Accordingly, the Court grants summary judgment in favor of the Bank on Counterclaim Count XV.

XII.   Counterclaim Count XVI – Barton's Claim for Trespass and Violation of Eviction Statutes under 14 M.R.S. § 6014

Counterclaim Count XVI alleges that the Bank trespassed and violated Maine eviction statutes when the Bank denied Barton access to the leased premise.[23] Specifically, Barton argues that the Bank violated 14 M.R.S. § 6014 in August of 2017 when Barton had a tenancy at will at the leased premises in the BIC and the Bank did not give Barton any of the statutorily required notices before evicting him by locking him out and denying him access to use the premises. The Bank argues that Barton was a tenant at will and, at the time of the alleged wrongful eviction, Barton had vacated the leased premises and essentially turned the property over to the Bank. The Court concludes that Barton has not met his burden of establishing a prima facie case of wrongful eviction under 14 M.R.S. § 6014 and, therefore, must grant summary judgment in favor of the Bank on Counterclaim Count XVI.

Under 14 M.R.S. § 6014, an illegal eviction occurs when a landlord willfully seizes, holds, or otherwise directly or indirectly denies a "tenant access to and possession of the tenant's rented or leased premises, other than through proper judicial process." This provision applies to both

---

[22] Therefore, it cannot be inferred that the Bank's decision to terminate Barton's line of credit was an attempt to put him out of business.

[23] Although Counterclaim Count XVI is vague about whether Barton is pursuing a common law trespass claim in addition to a wrongful eviction claim, the Court will treat Counterclaim Count XVI as strictly a wrongful eviction claim under 14 M.R.S. § 6014.

residential and commercial leases. *Rodriguez v. Tomes*, 610 A.2d 262, 264 (Me. 1992). The proper judicial process is set forth in 14 M.R.S. §§ 6001-6008 and contains certain notice requirements that a landlord must comply with in order to terminate a lease. However, the Court need not delve further into the requirements thereunder because Barton fails to state *any* facts in support for his wrongful eviction claim. Thus, in doing so, Barton has failed to meet his burden as the non-moving plaintiff. The Court grants summary judgment in favor of the Bank on Counterclaim Count XVI.

XIII. <u>Counterclaim Count XVII – Barton's Claim for Unfair Competition and Misappropriation of Trade Secrets and Conversion</u>

Counterclaim Count XVII alleges that the Bank wrongfully obtained and converted Barton's trade secrets and misappropriated them for their commercial benefit. Specifically, Barton argues that the Barton Portfolio Program, which is comprised of lending programs and procedures for risk management, underwriting, and compliance, falls within the definition of a "trade secret" under 10 M.R.S. § 1542(4) and that the Bank wrongfully obtained the Barton Portfolio Program and incorporated the information contained therein into its own business operations and methods with regard to the Bank opening its Third Party Lending program in 2014. The Bank's argument in response is threefold: (1) that the Barton Portfolio Program does not constitute a trade secret; (2) that Barton did not take reasonable steps to maintain secrecy; and (3) that the claim is time-barred. The Court concludes Barton has established a genuine issue of material fact regarding whether the Barton Portfolio Program constitutes or contains trade secrets, and denies the Bank's motion for summary judgment on Counterclaim Count XVII.

In order to qualify as a trade secret, information must, *inter alia*, "[d]erive[] independent economic value . . . ." 10 M.R.S. § 1542(4)(A). A five-factor test was announced in *Bernier v. Merrill Air Eng'rs* for determining whether information derives independent economic value, including *inter alia*, "the nature and extent of measures the plaintiff took to guard the secrecy of

27

the information." 2001 ME 17, ¶ 26 n.6, 770 A.2d 97 (citing *Spottiswoode v. Levine*, 1999 ME 79, ¶ 27 n.7, 730 A.2d 166).[24] Information claimed to be a trade secret must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." 10 M.R.S. § 1542(4)(B); *see Northeast Coating Techs., Inc. v. Vacuum Metallurgical Co.*, 684 A.2d 1322, 1324 (Me. 1996) (granting summary judgment for defendant on a claim for misappropriation of a trade secret when the plaintiff failed to present evidence that it took reasonable efforts to protect its alleged trade secret). "The definition of a trade secret is a matter of law, while the determination in a given case whether specific information is a trade secret is a factual question." *Id.* ¶ 27 (quotation marks omitted).

Barton, as the non-moving plaintiff on Counterclaim Count XVII, has met his burden of establishing a prima facie case that the Barton Portfolio Program is a trade secret and that it was misappropriated. Barton argues that the Barton Portfolio Program is a "trade secret" under 10 M.R.S. § 1542(4) because it derives independent economic value from not being generally known. Specifically, Barton argues that the policies, guidelines, and procedures contained within the Barton Portfolio Program have been developed since Barton's inception and gives Barton a competitive advantage due to its unique contents. In response, the Bank argues that the Barton Portfolio Program does not contain anything unique or proprietary and, instead, are just underwriting guidelines for portfolio loans, which contain guidelines commonly found throughout the mortgage lending industry. However, the bulk of the Bank's record citations in support of this argument are to the affidavit of Mary Miller, whose testimony as an expert witness was stricken by an Order of this Court on February 22, 2019. As a result, the Bank lacks record support for its

---

[24] "It is not sufficient to keep something private from the world . . . . Instead, there must be affirmative steps to preserve the secrecy of the information *as against the party against whom the misappropriation claim is made*." *Woodfords Family Servs. V. Casey*, 832 F. Supp. 2d 88, 97 (quotation marks omitted).

argument in regards to its characterization of the Barton Portfolio Program, and Barton has met his burden of putting forth prima facie evidence demonstrating that the Barton Portfolio Program derives independent economic value from not being generally known or ascertainable.

Nonetheless, the Bank also argues that the Barton Portfolio Program is not a trade secret because Barton failed to take reasonable steps to maintain its secrecy.[25] Specifically, the Bank states, for example, that Barton did not execute a non-disclosure agreement in connection with the Barton Portfolio Program, either with the Bank or Machias, and that this is enough to show that the Barton Portfolio Program is not a trade secret. Barton argues in his brief that he did take steps to preserve the Barton Portfolio Program's secrecy and sets forth facts that demonstrate that the Bank made assurances to him that the Barton Portfolio Program would be kept confidential. Specifically, Barton cites to several instances where he sought, and was given, assurances that the Barton Portfolio Program would be kept confidential and only used in connection with the business relationship between the Bank and Barton. Furthermore, Barton alleges that he took efforts to keep the Barton Portfolio Programs confidential when he was dealing with Machias. As a result, Barton has met his burden of setting forth prima facie evidence that he undertook reasonable efforts under the circumstances and this establishes a dispute of material fact as to whether the Barton Portfolio Program is a "trade secret" under 10 M.R.S. § 1542(4).

Barton also provides prima facie evidence that the Bank misappropriated the Barton Portfolio Program. Specifically, Barton states that the Bank incorporated the Barton Portfolio Program into its own Third Party Lending program, which was diametrically opposed to what the

---

[25] A showing that the plaintiff took reasonable steps to maintain its trade secret's secrecy is an essential element of a misappropriation of trade secrets claim. *See* 10 M.R.S. § 1542(4) (requiring a showing that the alleged trade secret must (1) derive independent economic value from not being readily ascertainable and (2) be the subject of efforts that are reasonable to maintain its secrecy). Therefore, Barton has the burden of setting forth prima facie evidence that he took reasonable steps to protect the secrecy of the Barton Portfolio Program.

Bank assured Barton it wouldn't do. The Bank, however, argues that it never used the Barton Portfolio Program in connection with its Third Party Lending program. Barton has done enough to establish a dispute of material fact as to whether the Barton Portfolio Program was misappropriated by the Bank. *See* 10 M.R.S. § 1542(2)(B)(2)(ii) (misappropriation occurs when a trade secret of another is used without their express or implied consent and, at the time of the use, the alleged misappropriator knew or had reason to know that his knowledge of the trade secret was acquired under circumstances that obligated him to limit its use). Therefore, because Barton has provided prima facie evidence of misappropriation trade secrets and has established a genuine dispute of material fact, the Court denies summary judgment on Counterclaim Count XVII.

XIV.   Counterclaim Count XVIII – Barton's Claim for Defamation

Counterclaim Count XVIII alleges that the Bank made certain false and defamatory statements about Barton's manner of doing business to third parties with the intent to injure Barton and, as a result, Barton suffered damages. Specifically, Barton argues that Logan made, with malice, false statements to Machias, insinuating that Barton's manner of doing business was fraudulent, and that these statements directly and proximately caused Barton to suffer damage to his business, personal reputation, and income and profits. The Bank, however, argues that Barton has not set forth the requisite facts to establish a prima facie case for defamation and that, even if he did, any communication that Logan made to Machias was not defamatory because it was either an opinion or it was subject to a conditional privilege. Accordingly, the Court concludes that Barton did not meet his burden of establishing a prima facie case of defamation and, therefore, must grant summary judgment in favor of the Bank on Counterclaim Count XVIII.

To succeed on a claim for defamation, a claimant must establish: "(1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) either actionability of the

30

statement irrespective of special harm or the existence of special harm caused by the publication." *Rippett v. Bemis*, 672 A.2d 82, 86 (Me. 1996). The Court need not expound further on the elements of defamation because Barton has failed to raise *any* facts in support of this claim. Here, Barton again misunderstands his burden on summary judgment as the non-moving plaintiff and, as a result, his claim for defamation must necessarily fail.

While the Bank properly asserted facts defending against the defamation claim, Barton failed to make any assertions of fact in his statement of additional facts that would establish a prima facie case for defamation. Instead, Barton only responds to the Banks factual assertions in his opposing statement of material facts by qualifying the Bank's statements of fact and attempting to introduce additional facts through his response. The reason Barton's response is improper is twofold: first, Barton's response does not create a dispute of fact as he asserts in his brief because disputes of fact are not properly raised when "conflicting assertions are not positively set forth, but instead appear as new facts in statements that qualify or object to affirmative statements of fact," *Estate of Frost*, 2016 ME 132, ¶ 20 n.4, 146 A.3d 118; and second, Barton's response does not establish a prima facie case for defamation because he commingles additional facts, which, if set forth properly, *may* have met his burden, with his response to the Bank's factual assertion, and the Court will not consider facts that are comingled in the non-moving party's paragraphs responding to the moving party's material facts.[26] *See Doyle*, 2003 ME 61, ¶ 11, 824 A.2d 48. Further, nothing in the comments made to Machias Savings Bank are defamatory on their face on

---

[26] Furthermore, even if Barton had stated these facts in his statement of additional facts, the Court would not consider them because it would be inadmissible hearsay and Barton would have no personal knowledge. Specifically, the only record citation that Barton cites as support for Logan's statements to Machias is his own affidavit, yet Barton was not a party to the conversation. Therefore, Barton's testimony in the affidavit would be inadmissible hearsay and he would have no personal knowledge to testify regarding the content of the discussion between Logan and Machias.

in context. Therefore, as a result of Barton failing to establish a prima facie case for defamation, the Court must grant summary judgment in favor of the Bank on Counterclaim Count XIV.

## **CONCLUSION**

For all the foregoing reasons, the Bank's motion for summary judgment is granted in part and denied in part. The case proceeds on count II (liability only) and count III of the Complaint, and on count II and count XVII of the Counterclaim.

So Ordered.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

Dated:_ May 13, 2019_____            ___/s_____

                                           Michael A. Duddy
                                           Judge, Business and Consumer Docket

STATE OF MAINE                          BUSINESS & CONSUMER DOCKET
CUMBERLAND, ss.                         LOCATION: PORTLAND
                                        DOCKET NO. BCD-CV-17-47 ✓


ANDROSCOGGIN SAVINGS BANK,              )
                                        )
                     Plaintiff,         )
                                        )
v.                                      )       ORDER STRIKING LAY OPINION
                                        )       TESTIMONY
BARTON MORTGAGE CORP. &                 )
DERON BARTON,                           )
                                        )
            Defendants/Counterclaim     )
            Plaintiffs                  )


Androscoggin Savings Bank (the "Bank") has submitted to the Court in support of its motion for summary judgment the affidavit testimony of an individual named Mary Miller ("Miller"). Defendants/Counterclaim Plaintiffs Barton Mortgange Corporation and Deron Barton ("Barton") object to the testimony, and have moved to strike the testimony on the grounds that the Bank has not designated Miller as an expert; the testimony contained in Miller's affidavit constitutes expert testimony; and as such, Miller's testimony constitutes impermissible lay opinion testimony.

Lay opinion testimony is permissible under M.R. Evid. 701, but only under certain carefully circumscribed conditions. First, the testimony must be grounded on the personal knowledge of the witness, just as would be the case with simple statements of fact. *Chrysler Credit Corp. v. Bert Cote's L/A Auto Sales*, 1998 ME 53, ¶ 21, 707 A.2d 1311 (omitting citation). Second, the testimony must be within the common knowledge of an ordinary person, and must not be derived from specialized

1

knowledge. *Mitchell v Kieliszek*, 2006 ME 70, ¶ 14, 900 A.2d 719. The categories of expert and lay opinion testimony are thus mutually exclusive. *Id.*

For the purposes of deciding this motion, the Court has reviewed Miller's affidavit. The testimony provided in the affidavit is not based on Miller's personal observations of events involving Defendants. Further, the testimony is based on specialized knowledge, rather than the common knowledge of an ordinary person. Hence, Miller's affidavit testimony constitutes expert testimony and is impermissible lay opinion testimony. However, the Bank has not designated Miller as an expert, and the deadline for such a designation has long since expired. Accordingly, the Court GRANTS Barton's motion to strike Miller's affidavit testimony, and the testimony shall not be considered in connection with the Bank's motion for summary judgment.

Pursuant to M.R. Civ. P. 79(a), the Clerk is instructed to incorporate this Order by reference on the docket for this case.

So Ordered.

February 22, 2019.

Michael A. Duddy
Judge, Business and Consumer Docket

Entered on the Docket: 2-22-19
Copies sent via Mail ___ Electronically ✓

2

STATE OF MAINE
CUMBERLAND, ss.

SUPERIOR COURT
BUSINESS AND CONSUMER COURT
DOCKET NO. BCD-CV-17-47 ✓

ANDROSCOGGIN SAVINGS BANK )
)
    Plaintiff/ Counterclaim-Defendant, )
)
    v. )
)
BARTON MORTGAGE CORP., et al., )
)
    Defendants/ Counterclaim-Plaintiffs, )
)

ORDER ON COUNTERCLAIM
DEFENDANT'S MOTION FOR
PARTIAL DISMISSAL OF
COUNTERCLAIM PLAINTIFF'S
COUNTERCLAIM

Before the Court is Plaintiff/ Counterclaim-Defendant Androscoggin Savings Bank's ("ASB") motion for partial dismissal of the Counterclaim filed by Defendants/ Counterclaim Plaintiffs Barton Mortgage Corporation ("BMC") and Deron Barton ("Barton"). ASB moves to dismiss Counts I, III, IV, VI, VII, VIII, XI, XII, XIII, XVI, and XVII of the Counterclaim on the basis that those counts fail to state a claim upon which relief may be granted. M.R. Civ. P. 12(b)(6). ASB further moves for the dismissal of Counts VI and VIII on the grounds that those claims do not contain a short and plain statement showing that Barton is entitled to relief. M.R. Civ. P. 8(a). BMC and Barton oppose the motion. Pursuant to its discretionary authority, the Court chose to rule on the motion without hearing. M.R. Civ. P. 7(b)(7).

## FACTUAL BACKGROUND

ASB filed its three-Count Complaint against BMC & Barton alleging default on a commercial promissory note for $110,000 in principal (Count I), violation of commercial sublease and $8,221.90 in unpaid rent (Count II-BMC), and default of obligations under personal guaranty (Count III-Barton). The Complaint attached the Sublease (Ex. 1), the Note (Ex. 2), and the Guaranty (Ex. 3). BMC and Barton answered the Complaint and filed their eighteen-count

1

Counterclaim. The gist of the Counterclaim, which goes into great detail, is that Barton, the principal of mortgage originator BMC, was "strung along" by executives and agents of ASB under the false pretense that ASB was interested in formalizing a joint venture or partnership with BMC. (Def's Countercl. ¶ 24.) This allegedly resulted in great advantage to ASB, and devastating harm to Barton and BMC. (*See generally* Def's Countercl.) The details of ASB and BMC's ill-fated putative partnership will be addressed to the extent they are relevant in the Discussion section *infra*.

## DISCUSSION

I.   THE ALLEGED CONTRACT IS SUBJECT TO THE STATUTE OF FRAUDS & NO EXCEPTION APPLIES

A. **Legal Standard, Factual Background, and Summary of Arguments**

Maine's statute of frauds requires that certain agreements be memorialized in writing and signed by the party "to be charged therewith." 33 M.R.S. § 51. "The purpose of a statute of frauds is to preclude false allegations of contract." *Wells Fargo Home Mortg., Inc. v. Spaulding*, 2007 ME 116, ¶ 20, 930 A.2d 1025 (quotation omitted). In particular:

> No action shall be maintained . . . [u]pon any agreement that is not to be performed within one year from the making thereof . . . [or] [u]pon any agreement to refrain from carrying on or engaging in any trade, business, occupation or profession . . . unless the promise, contract or agreement on which such action is brought . . . is in writing and signed by the party to be charged therewith . . . .

33 M.R.S. § 51(5),(8). In its Counterclaim, BMC alleges "various contractual commitments" owed by ASB to BMC. (Def's Countercl. ¶¶ 57, 60.) These contractual commitments are alleged to have arisen out of ASB President Paul Andersen's oral promises to BMC to refer all mortgage leads from ABS's Portland office to BMC and that BMC would be the bank's "exclusive partner" for residential lending in Southern Maine and its sole originator of mortgages in Cumberland and York

2

counties. (*Id.* ¶ 57.) It is undisputed that the alleged contract was intended to last for more than one year and that it required ASB to refrain from engaging in business or trade with other mortgage originators. (*See id.* ¶¶ 10, 13, 35.)

ASB's primary argument is that BMC's[1] breach of contract count, and any other claims flowing from the alleged breach of contract, should be dismissed because the alleged contract would be unenforceable due to operation of Maine's statute of frauds and no exception applies under the facts as alleged. (Pl's Mot. Dismiss 6-8.) BMC does not contest the proposition that its alleged agreement with ASB would fall within the statute of frauds. Instead, BMC counters that an affirmative defense cannot form the basis of a motion to dismiss, and that in any event, the statute of frauds cannot bar its claims because the facts alleged could support an exception to the application of the statute of frauds, specifically either part performance or promissory estoppel. (Def's Opp. Mot. Dismiss 5-12.) The Court considers these arguments and counterarguments in turn.

### B. A Motion to Dismiss can be Grounded in an Affirmative Defense

BMC first argues that this Court may not dismiss any claims based on an affirmative defense. (Def's Opp. Mot. Dismiss 3-6.) "Various of the defenses listed as affirmative under Rule 8(c) may be raised by motion to dismiss if the facts appear on the face of the summons and/or complaint." 2 Harvey *Maine Civil Practice* § 12.12 at 423 (3d. 2011). The statute of frauds is likely one of the "various" defenses, although our Law Court has not expressly ruled on the issue. *Id.* at 425; *see also Barrett v. Greenall*, 139 Me. 75, 78, 27 A.2d 599, 600-01 (1942) (dictum that statute of frauds could have formed the basis of a directed verdict in contract for the sale of land); *Berkowitz v. Marean*, No. CV-16-450, 2017 Me. Super. LEXIS 157, at *2 (Feb. 3, 2017) (citing

---

[1] Some Counts of the Counterclaim are brought only by BMC, some only by Barton, and some by both.

3

*Gray v. TD Bank, N.A.*, 2012 ME 83, ¶ 10, 45 A.3d 735) ("[A]n affirmative defense [is] typically asserted in the answer to a complaint rather than a motion to dismiss, [but] such a procedure is appropriate if facts giving rise to the defense appear on the face of the complaint.") (quotations omitted)). The weight of authority supports ASB's position that the Court may dismiss claims based on the affirmative defense of the statute of frauds.

## C. **Two Problems with Part Performance**

BMC next argues that on the facts alleged in its Counterclaim, the doctrine of part performance is "clearly applicable" as an exception to the statute of frauds. (Def's Opp. Mot. Dismiss 6-10.) "'After having induced or knowingly permitted another to perform in part an agreement, on the faith of its full performance by both parties and for which he could not well be compensated *except by specific performance*, the other shall not insist that the agreement is void.'" *Landry v. Landry*, 641 A.2d 182, 183 (Me. 1994) (quoting *Bell v. Bell,* 151 Me. 207, 211, 116 A.2d 921, 923 (1955) (emphasis added)). *See also Wells Fargo Home Mortg., Inc. v. Spaulding*, 2007 ME 116, ¶ 23, 930 A.2d 1025 ("well-established exceptions to the statute of frauds, such as part performance") (citing *Sullivan v. Porter*, 2004 ME 134, ¶ 10, 861 A.2d 625, 630).

As *Landry* and *Bell* make clear, part performance only applies where a party requests equitable relief in the form of specific performance—which BMC does not seek in its Counterclaim. The Superior Court (Cumberland County, *Warren, J.*) has expressly held that "part performance is only available as an exception to the Statute of Frauds in cases when specific performance is sought." *Jones v. Adam*, No. CV-06-226, 2007 Me. Super. LEXIS 141, *12 (July 13, 2007) (citing *Great Hill Fill & Gravel Inc. v. Shapleigh*, 1997 ME 75 ¶¶ 6-7, 692 A.2d 928; *Northeast Investment Co. Inc. v. Leisure Living Communities Inc.*, 351 A.2d 845, 855 (Me. 1976)).

Furthermore, under Maine law, part performance likely cannot operate as an exception to

4

the requirement that contracts that are not to be performed within one year must be memorialized in writing. Our Law Court has expressly held that part performance cannot obviate the writing requirement of the statute of frauds where a plaintiff seeks specific performance of an employment contract for a term of more than one year. *Stearns v. Emery-Waterhouse Co.*, 596 A.2d 72, 75 (Me. 1991). The Superior Court (Cumberland County, *Wheeler, J.*) has cited the Restatement (Second) of Contracts and *Stearns* for the proposition that "part performance does not generally apply to make the one-year provision inapplicable." *Thomsen v. Ward*, No. CV-11-14, 2012 Me. Super. LEXIS 75, at *22 (June 4, 2012) (citing Restatement (Second) of Contracts § 130, cmt. e).[2]

### D. Promissory Estoppel is Likewise Barred by the Statute of Frauds

Finally, BMC argues that its claim for promissory estoppel cannot be barred by the statute of frauds. (Def's Opp. Mot. Dismiss 10-12.) "The doctrine of promissory estoppel applies to promises that are otherwise unenforceable, and is invoked to enforce such promises so as to avoid injustice." *Harvey v. Dow*, 2008 ME 192, ¶ 11, 962 A.2d 322. Maine has adopted the definition of promissory estoppel set out in Section 90(1) of the Restatement (Second) of Contracts:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

*Id.* Our Law Court has limited the application of promissory estoppel as an exception to the statute of frauds in contracts for the sale of land to those situations where the party seeking to enforce the promise to convey has made substantial, physical improvements to the land in reasonable reliance on the promise. *See Harvey v. Dow*, 2008 ME 192, ¶ 13, 962 A.2d 322; *Tozier v. Tozier*, 437 A.2d

---

[2] Although the *Thomsen* court goes on to rule on summary judgment that the counterclaim-defendant had "fully performed his obligations" under the purported contract, rendering the statute of frauds inapplicable in any event, *see id.*, at * 27-28, this Court cites to the opinion for its persuasive reasoning rather than as *stare decisis*.

## II.    EMOTIONAL DISTRESS COUNTS

### A.    BMC Has Adequately Alleged A Claim for Negligent Infliction of Emotional Distress

ASB offers only one ground for the dismissal of Count VI: that because all of BMC's tort and breach of contract claims fail, NIED must fail as well. (Pl's Mot. Dismiss 8-9.) This is belied by the fact that ASB is moving only for partial dismissal. The Court thus DENIES the motion to dismiss as to Count VI.

### B.    ASB's Alleged Conduct Does Not State a Claim for Intentional Infliction of Emotional Distress

ASB urges the Court to perform a "gatekeeper" function and evaluate the claim for IIED to determine whether the facts alleged could reasonably justify a verdict for BMC. (Pl's Mot. Dismiss 10; Reply Br. 6.) BMC responds that the Court should not weigh the facts on a motion to dismiss, and the question of whether the facts alleged could support a finding of liability is better left to the jury. (Def's Opp. Mot. Dismiss 13-15.)

IIED requires, *inter alia*, that a plaintiff prove by a preponderance of the evidence that "the [defendant's] conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community . . . ." *Lyman v. Huber*, 2010 ME 139, ¶ 16, 10 A.3d 707. "Recent Law Court decisions have endorsed the trial court's role as gatekeeper regarding IIED claims, meaning to evaluate an IIED claim to determine whether the facts alleged could reasonably justify a verdict for the plaintiff." *Temm v. LPL Fin. LLC*, No. BCD-CV-16-14, 2016 Me. Super. LEXIS 68, at *7 (Bus. & Consumer Ct. Apr. 29, 2016). "[I]t is for the Court to determine, in the first instance whether the Defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery . . . ." *Champagne v. Mid-Maine Med. Ctr.*, 1998 ME 87, ¶ 16, 711 A.2d 842 (quoting *Colford v. Chubb Life Ins. Co. of Am.*, 687 A.2d 609, 616 (Me. 1996)).

In *Temm*, the Business & Consumer Court (*Horton, J.*) dismissed a count for IIED where the plaintiff alleged that the defendant had "lock[ed] him out, tr[ied] to prevent him from taking clients with him, spread[ ] misinformation about him to clients and others, and access[ed] his client files with his password." *Temm*, 2016 Me. Super. LEXIS 68, at *8. In *Lyman v. Huber*, 2010 ME 139, 10 A.3d 707, our Law Court vacated a judgment awarding IIED damages following a bench trial because the requisite severity of the plaintiff's emotional distress could not "be inferred from the extreme and outrageous nature of the defendant's conduct alone" where the defendant subjected the plaintiff, his domestic partner, to 15 years of verbal and emotional abuse. *Id.*, ¶ 24. *Lyman* was thus decided on a different but related issue. While the holding is therefore not controlling, the case does suggest that the Law Court is hesitant to allow a plaintiff to recover emotional distress damages unless the behavior complained of is truly abhorrent. *Cf. Liberty v. Bennett,* No. CV-09-459, 2010 Me. Super. LEXIS 2, *13-15 (Jan. 19, 2010) (declining to dismiss IIED claim because the "court [could] not say as a matter of law that the Defendant's actions definitively were not extreme and outrageous such that they would be regarded as atrocious and utterly intolerable" where the defendant was alleged to have, *inter alia*, destroyed "the parent/child relationship between the Plaintiff and her father," "took control of the day-to-day lives of the family," "threatened to foreclose a mortgage . . . if [Plaintiff] did not comply with his dictates," "disparaged Plaintiff by screaming at her, calling her names, and telling lies about Plaintiff to other people in her community . . . .").

Here, Barton has alleged that ASB stole his business plan and customers (Def's Countercl. ¶¶ 36, 39-40), tried to drive him out of business (*Id.* ¶ 37), attempted to sabotage his relationship with another bank (Countercl. ¶¶ 43-47), and stole or destroyed BMC property including customer files. (Countercl. ¶¶ 48-52.) This is in addition to Mr. Andersen's alleged misrepresentations that

9

"strung [Mr. Barton] along" under the false pretense of forming a joint partnership with him (Def's Countercl. ¶ 24) and the general allegations that ASB's misdeeds have cost him a lot of money. (Def's Countercl. ¶¶ 53-55.)

These allegations are analogous to the allegations in *Temm*. As the Business and Consumer Court stated in *Temm*, "lockouts and competing over clients, and more nefarious tactics like accessing private data and spreading rumors and misinformation about competitors are by no means unheard of in the context of the breakup of businesses, reprehensible though some of the tactics may be." *Temm*, 2016 Me. Super. LEXIS 68, at *8. The same principle applies here. The Court therefore GRANTS the motion to dismiss Count VII (IIED) on the grounds that the facts alleged are not sufficiently serious to warrant recovery of emotional distress damages.

III.     THE SUBLEASE CANNOT VITIATE THE TRESPASS CLAIMS

ASB urges this Court to dismiss Count XI (trespass) and Count XVI (trespass/ violation of eviction statute) based on the Sublease. (Pl's Mot. Dismiss 11-12.) The Sublease was attached to the Complaint and is referred to in the Counterclaim. *See Moody v. State Liq. & Lott. Comm'n*, 2004 ME 20, ¶ 10, 843 A.2d 4. BMC argues that ASB's argument is premised on factual assertions by ASB that are not found in the Counterclaim. (Def's Opp. Mot. Dismiss 15-16.) Notably, ASB does not dispute this contention in its reply brief.

The Court agrees with BMC that ASB relies on certain legal conclusions that require factual determinations: *e.g.* whether BMC "abandoned" the premises, when the lease was "terminated," and when (or if) an event constituting "default" took place. The Court therefore DENIES the motion to dismiss as to Count XI and XVI.

IV.     CORPORATIONS HAVE ONLY A LIMITED RIGHT TO PRIVACY

BMC alone brings a claim for invasion of privacy. (Def's Countercl. ¶ 105.) ASB argues

10

that only a "living individual" can maintain an action for invasion of privacy. (Pl's Mot. Dismiss 14.) BMC counters that "entities have been recognized as having the same fundamental rights as human beings." (Opp. Mot. 17-18.)

"[A]n action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." *Nelson v. Me. Times*, 373 A.2d 1221, 1225 (Me. 1977) (quoting Restatement (Second) of Torts, § 652I (1979)). "A corporation, partnership or unincorporated association has no personal right of privacy . . . . It has, however, a limited right to the exclusive use of its own name or identity in so far as they are of use or benefit, and it receives protection from the law of unfair competition." Restatement (Second) of Torts, § 652I(c) (1979).

In the Counterclaim, BMC alleges that ASB physically intruded upon the premises leased by BMC, examined personal effects therein, and gained access to personal property, and that these actions constituted an intentional intrusion upon the solitude and seclusion that BMC enjoyed in its private property. (Def's Countercl. ¶¶ 107-108.) The Counterclaim also alleges that BMC had a reasonable expectation of privacy in the contents of the files in its office. (Def's Countercl. ¶ 106.)

*Nelson* controls the outcome here. The invasion of privacy alleged is not an invasion of "the exclusive use of its own name or identity in so far as they are of use or benefit," as contemplated by the Restatement. *See Nelson*, 373 A.2d at 1225. BMC's attempt to narrow *Nelson*'s holding is unavailing, particularly in consideration of the full Restatement section relied upon by the *Nelson* Court.[3] The Court therefore GRANTS ASB's motion to dismiss Count XII.

---

[3] BMC cites to decisions of intermediate appellate courts in California and Michigan, which have held that entities have a right to privacy similar to that alleged by BMC in this case, but the Court declines to follow those cases in light of *Nelson*'s controlling holding.

11

## V. NO DEMAND WAS REQUIRED UNDER THE FACTS ALLEGED TO STATE A CLAIM FOR CONVERSION/ INTERFERENCE WITH CHATTELS

ASB argues that because BMC does not allege that any demand was made on ASB for the return of the items allegedly removed from BMC's office space, Count XIII (Conversion/ Interference with Chattels) must be dismissed. (Pl's Mot. Dismiss 13.) BMC counters that where a party charged with conversion has acquired possession of the property wrongfully, a demand for return by the person entitled to possession is not required. (Def's Opp. Mot. Dismiss 16-17.)

"The necessary elements to establish a claim for conversion are a showing that (1) the person claiming that his or her property was converted has a property interest in the property; (2) the person had the right to possession at the time of the alleged conversion; and (3) the party with the right to possession made a demand for its return that was denied by the holder." *Estate of Barron v. Shapiro & Morley, LLC*, 2017 ME 51, ¶ 14, 157 A.3d 769 (citing *Withers v. Hackett*, 1998 ME 164, ¶ 7, 714 A.2d 798). However, "[t]he person with the right to possession need only make a demand if the holder took the property rightfully . . . ." *Withers*, 1998 ME 164, ¶ 7, 714 A.2d 798. *Accord* Simmons, Zillman, & Gregory, *Maine Tort Law* § 6.09 at 132-33 (1999 ed.) ("Demand and refusal are not necessary to maintaining . . . a [conversion] action . . . whenever an act of conversion has been committed . . . . [U]nlawful possession obviates any need for demand and refusal . . . .").

Here, BMC has alleged explicitly that ASB wrongfully took possession of BMC's property. (Def's Countercl. ¶ 113.) This obviates the need for demand and refusal. The Court therefore DENIES ASB's motion to dismiss Count XIII.

## VI. THE COURT CANNOT DETERMINE WHETHER THE PURPORTED TRADE SECRET DERIVED INDEPENDENT ECONOMIC VALUE

ASB argues that because Barton/BMC shared his "Residential Mortgage Lending

Program" and "Unique Portfolio Products" with ASB that the Court should conclude that the information does not derive independent economic value. (Pl's Mot. Dismiss 14-15.) BMC counters that the determination of whether specific information is a trade secret is a factual question and thus cannot be resolved on a motion to dismiss. (Def's Opp. Mot. Dismiss 19-20.)

In order to qualify as a trade secret, information must, *inter alia*, "[d]erive[] independent economic value . . . ." 10 M.R.S. § 1542(4)(A). Our Law Court has announced a five-factor test for determining whether information derives independent economic value, including *inter alia* "the nature and extent of measures the plaintiff took to guard the secrecy of the information." *Bernier v. Merrill Air Eng'rs*, 2001 ME 17, ¶ 26 n.6, 770 A.2d 97 (citing *Spottiswoode v. Levine*, 1999 ME 79, ¶ 27 n.7, 730 A.2d 166). "The definition of a trade secret is a matter of law, while the determination in a given case whether specific information is a trade secret is a factual question." *Id.* ¶ 27 (quoting *Ed Nowogroski Ins., Inc. v. Rucker*, 971 P.2d 936, 941 (Wash. 1999)) (quotation marks omitted).

ASB's motion asks the Court to apply one of six factors—"the nature and extent of measures the plaintiff took to guard the secrecy of the information"—and determine as a matter of law that the information at issue (Residential Mortgage Lending Program and Unique Portfolio Products) does not derive independent economic value. ASB points to the allegations in the Counterclaim that BMC shared this information with ASB as grounds for this determination. (Def's Countercl. ¶ 136.)

The Court cannot determine on this allegation alone that the purported trade secrets do not derive independent economic value. There are five other factors for the Court to consider that ASB does not address in its motion. Furthermore, the Court would be required to make a factual determination regarding whether the information is a trade secret. *Bernier*, 2001 ME 17, ¶ 27, 770

13

A.2d 97. The Court therefore DENIES the motion to dismiss as to Count XVII.

## CONCLUSION

Based on the foregoing it is hereby ORDERED:

Plaintiff/ Counterclaim-Defendant ASB's motion for partial dismissal is GRANTED IN PART and DENIED IN PART as follows:

ASB's motion for partial dismissal is GRANTED as to Count I, Count III, Count IV, Count VII, Count VIII, and Count XII.

ASB's motion for partial dismissal is DENIED as to Count VI, Count XI, Count XIII, Count XVI, and Count XVII.

Dated: 5/29/18

Richard Mulhern
Judge, Business and Consumer Court

Entered on the Docket: 5-30-18
Copies sent via Mail___ Electronically ✓

14